United States Court of Appeals,

Fifth Circuit.

No. 91-2763.

Elvis E. JOHNSON, Plaintiff-Appellee,

v.

Robert SAWYER, et al., Defendants,

United States of America, Defendant-Appellant.

Oct. 14, 1993.

Appeal from the United States District Court for the Southern District of Texas.

Before GARWOOD, JOHNSON, and WIENER, Circuit Judges.

WIENER, Circuit Judge:

Supplemental and Amending Panel Opinion[1]

In this suit for damages under the Federal Torts Claims Act (FTCA or the Act),[2] the United States as Defendant-Appellant appeals the judgment of the district court in favor of the Plaintiff-Appellee Elvis E. Johnson. His FTCA action arises from the public dissemination of private taxpayer information about Johnson by agents of the Internal Revenue Service of the United States Department of the Treasury (IRS). Even though we now disagree with some of the central reasoning of the district court's decision—reasons approbated in our original opinion, we still find no reversible error on the issue of liability, and therefore reiterate our affirmance of that part of the judgment of the district court as well as the issue of special damages, albeit with the same modification of the pension loss element as rendered in our original opinion. We also confirm our earlier partial reversal and remand to the district court to permit its further explanation or re-calculation of the quantum of damages awarded for Johnson's emotional distress and mental anguish injuries.

I

---

[1]The original panel opinion, *Johnson v. Sawyer,* 980 F.2d 1490 (5th Cir.1992), pertains except to the extent expressly modified herein.

[2]28 U.S.C. §§ 1291, 1346, 2671-2680 (1988) (FTCA or the Act).

FACTS AND PROCEEDINGS

The facts of this case are reported in considerable detail in the published opinions of the district court,[3] and in the previous panel opinion.[4] We therefore set out in this revised opinion only those facts required to give necessary perspective to the issues of continuing significance presented by the instant appeal.

After the IRS issued two press releases concerning Johnson's conviction and plea bargain, he sued several of the IRS officials involved in the press release, claiming that the release of disclosed tax information violated 26 U.S.C. § 6103. Johnson subsequently amended his complaint to include an FTCA claim against the United States. His FTCA claim was based on the state law torts of (1) negligence and (2) invasion of privacy committed by publicly disclosing embarrassing private facts about the plaintiff. The FTCA claim was severed from those against the individual defendants and tried to the court without a jury. At the conclusion of the bench trial, the court refused to find for Johnson on the public disclosure cause of action. The court believed (mistakenly) that it could not find that the matter publicized was not a matter of public concern. On Johnson's negligence cause of action, however, the court granted him a judgment against the United States in the amount of $10,902,117. The United States timely appealed that judgment.

II

BACKGROUND LAW

A. *The Federal Tort Claims Act*

The FTCA constitutes a general but not unlimited waiver of the federal government's sovereign immunity from tort claims.[5] Under the Act, suits against the United States are authorized

> for injury or loss of property, or personal injury or death caused by negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission

---

[3] *Johnson v. Sawyer,* 760 F.Supp. 1216 (S.D.Tex.1991); *Johnson v. Sawyer,* 640 F.Supp. 1126 (S.D.Tex.1986).

[4] *Johnson v. Sawyer,* 980 F.2d 1490 (5th Cir.1992).

[5] *See* 28 U.S.C. § 2674 (1988).

occurred.[6]

The Act also provides that the United States will be liable in tort "in the same manner and to the same extent as a private individual under like circumstances."[7]

To recover under the FTCA, Johnson must have been able to succeed against the government in a *state* law tort cause of action. Johnson argued two state law tort causes of action that are relevant to the instant appeal. First, he argued that the government invaded his privacy by publicly disclosing embarrassing private facts about him. Second, he argued that the government also committed negligence per se by publicizing that information. Both are recognized theories of tort liability in Texas.

B. *26 U.S.C. § 6103*

Relevant to both claims of Johnson's state law causes of action is the statutory provision found at 26 U.S.C. § 6103. It expressly prohibits the public release of federal tax returns and return information disclosed to the IRS by taxpayers. That prohibition is subject to but a handful of narrow exceptions. Section 6103 provides:

(a) General rule.

Returns and return information shall be confidential, and except as authorized by this title—

(1) no officer or employee of the United States ... shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or employee or otherwise or under the provisions of this section.

"Return information" is defined as "a taxpayer's identity, the nature, source, or amount of his income, ... deficiencies, ... whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing."[8] And "taxpayer identity" is defined as the name, mailing address, taxpayer identifying number, or any combination thereof.[9]

---

[6]28 U.S.C. § 1346(b); *see United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 807-08, 104 S.Ct. 2755, 2761-62, 81 L.Ed.2d 660 (1984).

[7]28 U.S.C. § 2674.

[8]26 U.S.C. § 6103(b)(2)(A).

[9]*Id.* § 6103(b)(6).

III

UNDERLYING STATE TORTS

A. *Invasion of Privacy*

 1. *Background*

Texas recognizes an invasion of privacy cause of action for public disclosure of private facts, the elements of which are:

1) Publicity was given to matters concerning the plaintiff's private life;

2) The publication of these matters would be highly offensive to a reasonable person of ordinary sensitivities;  and

3) The matter publicized is not of a legitimate public concern.[10]

The Texas Supreme Court has articulated at least five factors to be considered in a public disclosure cause of action.  First, this tort requires more than mere "publication" (as distinguished from "publicity") of the private information.  " "*Publicity* ' requires communication to more than a small group of persons;  the matter must be communicated to the public at large, such that the matter becomes one of public knowledge."[11]

Second, Texas will not protect an individual's privacy interest in private facts if those facts are a matter of public record.[12]  This rule appears to be an expansion of the rule announced by the United States Supreme Court in *Cox Broadcasting Co. v. Cohn.*[13]  In *Cox Broadcasting,* the Supreme Court held that the press could not be held liable for publishing information contained in public records.[14]  It seems that Texas interprets the *Cox Broadcasting* holding broadly, extending its protection to anyone who publicizes such information.  "The Court [in *Cox Broadcasting* ] thus held that the State *may not protect* an individual's privacy interests by recognizing a cause of action in tort

---

[10]*Industrial Foundation of the South v. Texas Industrial Accident Board,* 540 S.W.2d 668, 682 (Tex.1976).

[11]*Id.* at 683-84 (emphasis added).

[12]*Id.* at 684.

[13]420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975).

[14]*Id.* at 496, 95 S.Ct. at 1046-47.

for giving publicity to highly private facts if those facts are a matter of public record."[15]

Third, determination whether a given matter is one of legitimate public concern must be made in the factual context of each particular case. One factor to be considered in this determination is whether the government itself has statutorily recognized that the individual's privacy interest in the matters under scrutiny outweighs the public's interest in disclosure.[16]

Fourth, an individual does not automatically waive his privacy interest in information merely because he discloses that information to a government agency; "the voluntariness of the disclosure should be viewed in light of the circumstances under which the disclosure is made."[17]

Finally, Texas presumes that the information is not of legitimate concern to the public if it contains highly intimate or embarrassing facts the publication of which a reasonable person would find objectionable; the burden is on the publicizing party to show otherwise.[18]

2. *The Invasion of Johnson's Privacy*

The record demonstrates that Johnson not only had a viable public disclosure cause of action, but also that he introduced sufficient evidence at trial to prevail on that claim. First, the IRS clearly gave "publicity" to matters concerning Johnson's private life. As noted, the publicity element of this cause of action requires more than mere publication, and the IRS did considerably more than merely publish the information; it caused two IRS press releases to be published in at least twenty-one newspapers of general circulation.[19] It is also clear beyond question that one's income tax return is private information. The comments to § 652D of the Restatement (Second) of Torts use income tax

---

[15]*Industrial Foundation,* 540 S.W.2d at 684 (emphasis added).

[16]*Id.* at 685.

[17]*Id.*

[18]*Id.*

[19]*See* Restatement (Second) of Torts § 652D cmt. a ("[A]ny publication in a newspaper or a magazine, even of small circulation ... is sufficient to give publicity within the meaning of the term as it is used in this Section.").

returns as an example of records in which one retains a privacy interest.[20]

Johnson presented sufficient evidence to support a finding that the information publicized by the IRS would have highly offended a reasonable person of ordinary sensibilities. Section 6103 becomes relevant in reference to this element of a public disclosure cause of action. Section 6103 embodies a congressional determination that return information is confidential. Congress did not seek to protect solely the financial aspect of return information but the personal aspect as well, expressly prohibiting inter alia the release of the taxpayer's identity. That Congress statutorily recognized the magnitude of this privacy interest is strong evidence that a reasonable person would indeed be highly offended by the publication of his return information.

Further, Johnson did establish that the disputed information was not of public concern, contrary to the district court's unfortunate, conclusionary statement.[21] As the Texas Supreme Court instructs us, this determination must be considered in the context of each particular case.[22] Johnson has the benefit of two independent determinations that the information in question is not of legitimate public concern.

First, in accepting Johnson's guilty plea, the federal district judge—incidentally, not the same judge who tried the instant civil suit—did not find it necessary to include Johnson's full (and recognizable) name, his age, his home address, or his position with American National Insurance Corp. This is convincing evidence that, prior to the press releases, a court had already judicially determined—at least by undeniable implication—that the return information at issue was not of legitimate public concern.

Second, in § 6103 Congress characterized tax return information as "confidential" and mandated that "except as authorized by this title—no [person] shall disclose any return or return

---

[20]*Id.* cmt. b ("[I]f the record is one not open to public inspection, *as in the case of income tax returns,* it is not public, and there is an invasion of privacy when it is made so.") (emphasis added).

[21]This basis of liability was not discussed in the original panel opinion as this court was affirming the district court's finding of liability on the alternative ground of negligence.

[22]*Industrial Foundation,* 685 S.W.2d at 685.

information."[23]  In enacting this law, Congress expressed its intention to protect the privacy rights of taxpayers.[24]  It is implicit in such action that Congress weighed the conflicting interests implicated in this issue and found that, with certain specified exceptions, the taxpayer's privacy interest outweighed the interests supporting greater public disclosure.

True, the Supreme Court has made clear that the Constitution does protect the publicizing of information contained in court documents open to the public.  "At the very least, the First and Fourteenth Amendments will not allow exposing *the press* to liability for truthfully publishing information released to the public in official court records."[25]  But, the Court did not stop with that statement;  it proceeded to explain how the government could still protect privacy interests:

> If there are privacy interests to be protected in judicial proceedings, the States must respond by means which avoid public documentation or other exposure of private information.  Their political institutions must weigh the interests in privacy with the interests of the public to know and of the *press* to publish.[26]

In instances such as those now before us, it is evident that both Congress and the district court weighed the private and public interests and determined that the privacy interests must prevail.  It is entirely appropriate, then, to recognize § 6103 as the source of a standard of conduct for IRS agents (the persons who owe the duty of care) in public disclosure invasion of privacy cases involving the

---

[23]26 U.S.C. § 6103(a).

[24]*See Chamberlain v. Kurtz,* 589 F.2d 827, 835 (5th Cir.1979) ("New section 6103 of the Internal Revenue Code was enacted *primarily to regulate and restrict access to tax return information* by the many government bodies and agencies that routinely had access to such information under former section 6103") (emphasis added);  *First Western Government Securities, Inc. v. United States,* 796 F.2d 356, 359 (10th Cir.1986) ("Sections 6103 and 7217 were enacted *to protect a taxpayer's reasonable expectation of privacy.*") (emphasis added); S.Rep. No. 94-938, 94th Cong., 2d Sess. at 315-18, *reprinted in* 1976, U.S.Code Cong. & Admin.News at 3744-47 (discussing concerns that the degree of disclosure permitted under the previous law "*breaches a reasonable expectation of privacy* on the part of the American citizen.") (emphasis added).

[25]*Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 596, 95 S.Ct. 1029, 1204, 43 L.Ed.2d 328 (1975) (emphasis added).

[26]*Id.* (emphasis added).  We further note that *Cox Broadcasting* dealt with the issue of protecting freedom of the press under the First Amendment, and not with the rights of private citizens or IRS agents to invade the privacy of third parties.

publicizing of return information.[27]   Nothing in § 6103 either expressly limits its purview to civil matters, or expressly exempts criminal matters.

We find that the district court erred in not holding for Johnson on his public disclosure cause of action.  Nonetheless, that holding did not deter the district court from awarding damages to Johnson.  Instead, the court awarded damages to Johnson on the basis of his negligence cause of action.  As we affirmed that award in our original opinion, we now re-examine Johnson's negligence cause of action under Texas law as it applies to the FTCA.

B. *Negligence and Negligence Per Se*

1. *Background*

Texas defines the elements of a cause of action in negligence as:  1) the existence of a legal duty owed by one person to another;  2) a breach of that duty;  and 3) damages proximately resulting from that breach.[28]  Texas courts have consistently recognized that the existence of a duty is the threshold inquiry in a negligence action.[29]

Texas courts have also recognized that they may adopt a standard of conduct set forth in a statute as the appropriate measure of care owed under such a duty.[30]  An important prerequisite to the adoption of a statute as establishing the applicable standard of care is that the plaintiff be a member of the class of persons intended to be protected by the statute.[31]

The essence of Johnson's negligence argument is that:  1) The government, like any other person, owed him a duty under Texas common law to act reasonably with regard to not invading his

---

[27]It may be prudent to state in any such revised opinion that the court is not expressing an opinion as to whether it adopts § 6103 as the relevant standard of conduct if the return information is merely published rather than publicized.

[28]*El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987).

[29]*El Chico,* 732 S.W.2d at 311.

[30]*E.g. Poole,* 732 S.W.2d at 312 (holding that the applicable standard of care "may" be determined by a penal statute);  *Nixon v. Mr. Property Management,* 690 S.W.2d 546, 549 (Tex.1985) ("This ordinance legislatively imposes a standard of conduct which we adopt to define the conduct of a reasonably prudent person.").

[31]*El Chico v. Poole,* 732 S.W.2d 306, 312 (Tex.1987).

privacy;  2) the court should adopt § 6103 as enunciating an appropriate standard of care under the facts of this case;  3) the government failed to comply with § 6103's standard of care, and therefore was negligent per se;  and 4) that negligent conduct proximately caused Johnson's injury.

The government counters that the breach of a federal statute, here § 6103, cannot establish liability under the FTCA.  As far as it goes that statement is irrefutable, but it stops short of addressing the full import of Johnson's position—a position grounded in the subtle but crucial distinction between a *duty* and a *standard of care*.[32]  Johnson does not contend simplisticly that § 6103 creates a duty the breach of which constitutes a state tort, or that the violation of that statute ipso facto creates FTCA liability.  Rather, he asserts that, for purposes of the state tort of public disclosure of private facts, § 6103 sets a standard of care for those actors who owe the duty, and that, under Texas tort law, the violation of such a statutory standard of care is negligence per se when one to whom the duty is owed is damaged by violation of this standard of care.

 2. *Source of Duty;  Standards of Care*

The Restatement (Second) of Torts describes the term "duty" as follows:

The word "duty" is used throughout the Restatement of this Subject to denote the fact that the actor is required to conduct himself *in a particular manner* at the risk that if he does not do so he becomes subject to liability to another to whom the duty is owed for any injury sustained by such other, of which that actor's conduct is a legal cause.[33]

Prosser and Keeton describe the distinction between duty and a standard of conduct as follows:

"[D]uty is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff;  and in negligence cases, the duty is always the same—to conform to the legal standard of reasonable conduct in the light of apparent risk.  What the defendant must do, or must not do, is a question of the standard of conduct required to satisfy the duty.  The distinction is one of convenience only, and it must be remembered that the two are correlative, and one cannot exist without the other.[34]

Despite the correlative nature of these two principles, Texas courts consistently strive to distinguish

---

[32]We readily admit that, in our original panel opinion, we too confused duty with standard of care and misspoke when we said, as had the district court, that § 6103 created the duty owned to Johnson when we should have stated that it announced the standard of care owed.

[33]Restatement (Second) of Torts § 4 (emphasis added).

[34]W. Page Keeton et al., *Prosser and Keeton on the Law of Tort* § 53 (5th ed. 1984).

between creating a duty and establishing a relevant standard of care under that duty.[35]

There appears to be no single, definitive source of duty in our society; instead, duty is created by societal consensus or will. The Texas Supreme Court has stated: "[C]hanging social conditions lead constantly to the recognition of new duties. No better general statement can be made, than the courts will find a duty where, in general, reasonable men would recognize it and agree that it exists."[36]

As previously noted, Texas defines the elements of a cause of action in negligence as: 1) the existence of a legal duty owed by one person to another; 2) a breach of that duty; and 3) damages proximately resulting from that breach.[37] Texas courts have consistently recognized that the existence of a duty is the threshold inquiry in a negligence action.[38]

As also previously noted, Texas courts have consistently recognized that, given a duty, they may adopt a statute as enunciating the appropriate standard of conduct under that a duty.[39] It is important to note, however, that Texas courts are under no obligation to do so. "It is well established that the mere fact that the Legislature adopts a criminal statute does not mean this court must accept it as a standard for civil liability."[40]

The fact that the courts of Texas have discretion whether to adopt a statute as an appropriate

---

[35]*See Poole,* 732 S.W.2d at 312 ("*Separate and apart* from our recognition here of a common law *duty* of reasonable care based on the principle of foreseeability, the attendant *standard of conduct* may in addition be determined by a penal statute.") (emphasis added).

[36]*Otis Engineering Corp. v. Clark,* 668 S.W.2d 307, 309-10 (Tex.1983) (quoting W. Prosser, *The Law of Torts* at 327 (4th ed. 1971)).

[37]*El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987).

[38]*El Chico,* 732 S.W.2d at 311.

[39]*E.g. Poole,* 732 S.W.2d at 312 (holding that the applicable standard of care "may" be determined by a penal statute); *Nixon v. Mr. Property Management,* 690 S.W.2d 546, 549 (Tex.1985) ("This ordinance legislatively imposes a standard of conduct which we adopt to define the conduct of a reasonably prudent person.");

[40]*Carter v. William Sommerville and Son, Inc.,* 584 S.W.2d 274, 278 (Tex.1979); *Rudes v. Gottschalk,* 159 Tex. 552, 324 S.W.2d 201, 204 (1959) ("We adopt the statutory test rather than that of the ordinarily prudent man as the more accurate one to determine negligence because the Legislature, by reason of its organization and investigating processes, is generally in a better position to establish such tests than are the judicial tribunals. But this does not mean that the criminal statute is always accepted as a test of negligence by the civil court under all circumstances.").

standard of conduct is further evidence that such statutes cannot create the duty. Simple logic teaches that if a statute actually created a duty, the courts could not be free to adopt or reject the statute as establishing the relevant standard of conduct for that duty. But, as Texas courts do have the discretion to adopt or not adopt a statute as a standard of conduct, a statute thus adopted necessarily cannot itself be the source of the underlying duty.[41]

3. *The Instant Duty and Standard of Care*

We have already observed that Johnson could assert an invasion of privacy cause of action under Texas common law against a person who publicized embarrassing private facts about him. The existence of this cause of action is completely independent of § 6103. The principles on which this cause of action is based—and not § 6103—also establish a duty upon which a negligence cause of action can be grounded. "In negligence cases, the duty is always the same—to conform to the legal standard of reasonable conduct in the light of apparent risk."[42] To define the bounds of a duty, Texas courts apply the familiar *Palsgraf* rule: "The risk reasonably to be perceived defines the duty to be obeyed...."[43] Under the instant facts, it was certainly foreseeable that the disclosure made by the IRS would harm Johnson. Thus, the *duty* of the agents to conduct themselves reasonably in light of the obvious risk of harm to Johnson also existed independently of § 6103.

Instead of creating a duty on the part of the IRS toward Johnson (as found by the district court and as initially found by this panel's majority), § 6103 simply establishes a standard of care applicable to the independently existing duty to refrain from publicizing damaging or embarrassing private facts about another person. Allowing a federal statute, such as § 6103, to be used a standard

---

[41]Contrary to the dissent's view, we do not "[i]n substance, admit[ ] that absent section 6103 these facts would not give rise to liability under the Texas common law tort of "public disclosure of embarrassing private facts about another.' " As set forth at length in the above text, the duty not publicly to disclose private facts about another exists independently of § 6103. This court is simply adopting § 6103 as enunciating the proper standard of care under that duty. If § 6103 did not exist, the district court could doubtlessly formulate its own articulation of the appropriate standard of care, as could any Texas court of competent jurisdiction.

[42]W. Page Keeton et al., *Prosser and Keeton on the Law of Tort* § 53 (5th ed. 1984).

[43]*See Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 526 (Tex.1990) (quoting *Palsgraf v. Long Island R.R. Co.,* 248 N.Y. 339, 162 N.E. 99, 100 (1928)).

of care is wholly consistent with the jurisprudence of this circuit. For example, in *Moorhead v. Mitsubishi Aircraft International, Inc.,*[44] federal procedures contained in the *FAA Flight Service Handbook* were found to set the applicable standard of care under Texas tort law, albeit the *duty* of care was a creature of the common law. Also, in *Gibson v. Worley Mills, Inc.,*[45] we found, in an alternative holding, that under Texas law, the sale of a certain seed mixture was negligence per se because the sale was forbidden by 7 U.S.C. §§ 1561, 1571 (1976).[46]

Neither are we convinced that this holding is affected by *United States v. Smith*[47] or *Tindall v. United States.*[48] In *Tindall,* we construed *Mississippi* tort law and found that the government had no duty to warn anticipated users of the potential dangers of certain devices.[49] In footnote eight of that opinion, we rejected the proposition that a federal statute alone could establish a duty to the plaintiff. In this revised opinion for the instant case, we remain consistent with *Tindall* as we reject the district court's holding that § 6103 itself creates an actionable duty. We do find, though, that Texas tort law recognizes per se negligence when a statute or ordinance meant to protect a class of persons is violated—totally irrespective of whether that statute or ordinance originates with federal, state, county, or city action. Thus, § 6103 can be a valid source of the standard of behavior for Texas tort law purposes. We are similarly satisfied that the result we reach today is not inconsistent with our decision in *Smith,* which construed *Georgia* tort law.[50]

As we noted above, the government can only be held liable under the FTCA "in the same

---

[44]828 F.2d 278, 282 (5th Cir.1987).

[45]614 F.2d 464 (5th Cir.1980).

[46]*Id.* at 466; *see, e.g., In re Aircrash at Dallas/Fort Worth Airport,* 720 F.Supp. 1258, 1288 (N.D.Tex.1989) (relying on federal regulations—specifically the *Federal Air Traffic Control Manual* and FAA Order 7110.65D—for the standard of care under Texas tort law), *aff'd,* 919 F.2d 1079 (5th Cir.1991), *cert. denied,* --- U.S. ----, 112 S.Ct. 276, 116 L.Ed.2d 228 (1992).

[47]324 F.2d 622 (5th Cir.1963).

[48]901 F.2d 53 (5th Cir.1990).

[49]*Id.* at 56.

[50]*See Smith,* 324 F.2d at 624-25.

manner and to the same extent as a private individual under like circumstances";[51] and Texas expressly allows a cause of action for public disclosure of private facts. That cause of action is a nominate action for invasion of privacy and is not excluded from the FTCA. Neither is that cause of action the equivalent of libel or slander, both of which are expressly excluded from FTCA coverage under 28 U.S.C. § 2680(h). And, completing the picture, we find, as we explain in the ensuing few paragraphs, that a private actor may be held civilly liable under Texas tort law for a violation of the standard of conduct established in § 6103.

To grasp the full import of this point, it is necessary to focus on the operational or functional structure of § 6103, which is entitled "Confidentiality and disclosure of returns and return information." Subsection (a) states the general rule that returns and return information shall be confidential, then specifies three broad categories of persons who are prohibited from disclosing such confidential information. First, subsection (1) of § 6103(a) prohibits *federal* officers and employees from making such disclosures. Second, subsection (2) of § 6103(a) prohibits *state* officers and employees as well as by those of certain *local* agencies, who have or had access to returns or return information under § 6103 from making such disclosures. Third, and most importantly for this review, subsection (3) of § 6103(a) prohibits disclosure by *any person*—no mention whatsoever of governmental employment or affiliation at any level—who has access to returns or return information under the aegis of various other subsections of § 6103. Again, § 6103 does not purport to *create* a *duty* owed to the class of potential victims, i.e., taxpayers. Rather it implicitly acknowledges that such a duty exists by establishing a standard of care *and* by identifying three specific classes of persons who owe the duty and whose actions are therefore governed by the standard of care § 6103 demands.

Among the subsections listed in the catch-all provision of § 6103(a)(3) is § 6103(n). That the reference to § 6103(n) in § 6103(a)(3) is meant to cover persons of the private sector is confirmed in its recognition that, in the course of the government's obtaining services from the private sector, "returns and return information may be disclosed to any person ... to the extent necessary in

---

[51]28 U.S.C. § 1346(b).

connection with the processing, storage, transmission, maintenance, repair, testing, and procurement of equipment, and the providing of other services, for the purpose of tax administration."[52] Obviously, then, § 6103(n) contemplates the likelihood, nay, the certainty, that such confidential information will of necessity be disclosed to employees of private sector independent contractors providing goods and services to the Treasury Department and the IRS, *and* that the express prohibitory language of § 6103(a)(3) is needed to extend its proscription to such private sector employees.[53]

Thus, for example, if in Texas a non-governmental computer programmer or computer maintenance worker were to be furnished or should otherwise encounter the kind of confidential return information the disclosure of which is prohibited by § 6103(a), his or her wrongful disclosure in violation of the prohibition clearly could subject such a worker to Texas tort liability—analogous to subjecting the government to liability in the instant case.[54] We find it appropriate under Texas law to adopt this statute as the setting forth the relevant standard of conduct for Johnson's negligence claim.

4. *Johnson's Negligence Action*

The Texas Supreme Court has held repeatedly that "[t]he unexcused violation of a statute setting an applicable standard of care constitutes negligence as a matter of law if the statute is designed to prevent an injury to the class of persons to which the injured party belongs."[55] Johnson

---

[52]28 U.S.C. § 6103(n).

[53]*Cf. Wiemerslage v. United States,* 838 F.2d 899, 902 (7th Cir.1988) (illustrating that non-governmental employees are sometimes given access to confidential tax return information).

[54]Our research reveals only four cases in which § 6103(n) was mentioned, none of which are relevant to the instant case. *See Wiemerslage,* 838 F.2d at 902; *Ungaro v. Desert Palace, Inc.,* 732 F.Supp. 1522 (D.Nev.1989); *Crismar Corp. v. United States,* 1989 WL 98843 (E.D.La.); *Crown Cork & Seal Co. v. Pennsylvania Human Relations Comm'n,* 463 F.Supp. 120 (E.D.Penn.1979). We believe it is clear, however, that a "private individual under like circumstances" could be held liable under Texas tort law for a violation of the protections afforded to taxpayers by § 6103.

[55]*El Chico v. Poole,* 732 S.W.2d 306, 312 (Tex.1987) (citing *Nixon v. Mr. M Property Management Co.,* 690 S.W.2d 546, 549 (Tex.1985), and *Murray v. O & A Express, Inc.,* 630 S.W.2d 633, 636 & n. 4 (Tex.1982)); *see Moughon v. Wolf,* 576 S.W.2d 603, 604 (Tex.1978); *Missouri P. R.R. v. American Statesman,* 552 S.W.2d 99, 103 (Tex.1977).

was clearly a member of the class of persons that the statute was written to protect,[56] and none of the recognized excuses for violation of a protective statute apply in this case.[57]

The threshold question, therefore, is whether a violation of § 6103's standard of care occurred at all. Johnson asserts that by releasing the protected information about him, the IRS agents clearly violated § 6103. Even though some of the information released about Johnson had been discussed in his tax evasion proceeding, other information about him that was released to the press was neither discussed in that court proceeding nor otherwise appeared in the record of the court. Although provisions of § 6103 exempt certain disclosures,[58] no provision specifically exempts disclosures such as those made in the instant case.

The government urges this court to adopt the rule of the Ninth Circuit that once information is disclosed in open court or is in some other manner stripped of the confidentiality requirement of

---

[56]In 1976, § 6103 was amended as part of a sweeping reform of the tax code. The goal of this amendment to the code was two-fold. Congress wanted to stem the tide of information, which was voluntarily disclosed to the IRS, from being disclosed to other persons or agencies because of privacy needs of those who disclosed information (i.e., all taxpayers). Congress also reasoned that the possible abuses of privacy of the system could "seriously impair the effectiveness of our country's very successful voluntary assessment system which is the mainstay of the Federal tax system." S.Rep. No. 938, 94th Cong., 2d Sess., pt. 1, at 317 (1976), *reprinted in* 1976 U.S.C.C.A.N. 3439, 3747. *See generally Mertens Law of Federal Income Taxation: Tax Reform Act of 1976 Analysis* 117-25 (James J. Doheny ed., 1977).

[57]In *Impson v. Structural Metals, Inc.,* 487 S.W.2d 694, 696 (Tex.1972), the Texas Supreme Court approved the *Restatement (Second) of Torts* § 288A as substantially stating Texas law concerning civil liability for violation of a penal statute. Section 288A provides five categories of situations where a statutory violation is excused. They are:

> (a) the violation is reasonable because of the actor's incapacity;
>
> (b) the actor neither knows nor should know of the occasion for compliance;
>
> (c) the actor is unable after reasonable diligence or care to comply;
>
> (d) the actor is confronted by an emergency not due to his own misconduct;
>
> (e) compliance would involve a greater risk of harm to the actor or to others.

*Id.; see O & A Express,* 630 S.W.2d at 636 n. 4.

[58]*See, e.g., id.* § 6103(h)(4).

§ 6103, the IRS may release that information with impunity.[59] In *Lampert v. United States,* the Ninth Circuit stated that "Congress sought to prohibit only the disclosure of confidential tax return information" and held that "[o]nce tax return information is made a part of the public domain, the taxpayer may no longer claim a right of privacy in that information."[60] Thus, that circuit holds that information disclosed in a criminal proceeding against a taxpayer may be released to the press by the IRS without violating § 6103.

Johnson counters by urging us not to accept the Ninth Circuit's rule but instead to adopt the rule of either the Tenth or the Seventh Circuits on this issue. The Tenth Circuit holds that information protected by § 6103 never loses its confidentiality, even when it is disclosed in a court record.[61] The Seventh Circuit holds that the "immediate source" of the information, at least in a cases of information being taken from a court opinion or record, might control confidentiality. Specifically, the Seventh Circuit has held that when the facts disclosed are gleaned from court records, no § 6103 violation occurs.[62] The Seventh Circuit did not speculate, however, as to what the outcome might be in a case in which the "immediate source" of the information is the confidential records of the taxpayer but the information can also be found in a court record. Neither did that court speculate as to the possible outcome of a case in which the "immediate source" of the information is the tax records but the information is not to be found in a court record.[63]

The circumstances of the instant case are such that we are not required to adopt a rule from among those of the several circuits as the one henceforth to be applied in this circuit. Such a choice is unnecessary here because we are faced with a fact pattern unlike any yet ruled on in one of those

---

[59]*See William E. Schrambling Accountancy Corp. v. United States,* 937 F.2d 1485, 1488-89 (9th Cir.1991), *cert. denied,* --- U.S. ----, 112 S.Ct. 956, 117 L.Ed.2d 123 (1992).

[60]854 F.2d 335, 338 (9th Cir.1988), *cert. denied,* 490 U.S. 1034, 109 S.Ct. 1931, 104 L.Ed.2d 403 (1989).

[61]*See Rodgers v. Hyatt,* 697 F.2d 899, 906 (10th Cir.1983); *see also Chandler v. United States,* 887 F.2d 1397, 1397-98 (10th Cir.1991) (following *Rodgers v. Hyatt* ).

[62]*Thomas v. United States,* 890 F.2d 18, 20-21 (7th Cir.1989).

[63]*See id.*

other circuits. Here, the "immediate source" of the information was the taxpayer's confidential records but the information was not contained in any court record. Thus, the subject information would have never lost its entitlement to confidentiality under any of the rules yet espoused by other circuits. Although we make no rule selection, we nevertheless observe that even if we were to follow the Ninth Circuit's rule as typified in its *Lampert* decision (which here we neither adopt nor reject), the disclosures made by the IRS agents in the instant case would still constitute a violation of § 6103.

Both of the press releases about Johnson contained more information than was contained in the official record of his plea and sentencing hearing. True, several items contained in the press releases (Johnson's first and last name, the guilty plea to one count of tax evasion, the sentence imposed, and the fact that he was an executive with American National) were part of the trial record. But several other items contained in those releases (Johnson's middle initial—he was known as "E.E.", his age, his home address in Galveston, and his official job title with American National[64]) were neither discussed at his arraignment nor sentencing or placed in any public record. The government concedes that additional information about Johnson had been taken from his confidential taxpayer file or from the IRS investigation of Johnson, and inserted in the press release.

The *Lampert* court held that the fact that the information was contained in a public record, in effect, prevented its release from constituting a violation of § 6103. In the instant case, by contrast, the truly significant portions of the released information were *not* contained in any public record, so even under *Lampert* no convincing argument can be made that the entire release was shielded and did not violate § 6103, merely because some of the fact in the release were in the public domain.

We find inescapable the conclusion that the IRS agents' violations of the standard of behavior established in § 6103 amounted to negligence under Texas tort law—if not to either reckless disregard or deliberate violation of that standard. Even under the relaxed *Lampert* rule, which again we neither adopt nor reject, the IRS agents' activities actionably violated § 6103's standard.

---

[64]The only reference during the proceeding about Johnson's job was the court's remark that "arrangements can be made to relax [the terms of Johnson's parole] to the extent that they will not interfere with the performance of [Johnson's] position as an executive for the American National Insurance Company."

After Johnson pleaded guilty, special agent Stone called Powers to ascertain the results of the conviction and plea arrangement. Immediately following that discussion, in which Powers informed Stone of all terms of the plea arrangement, Stone nevertheless took it upon himself to contact Public Affairs Officer Sally Sassen, to report Johnson's conviction on his plea and, without mentioning the proscription of publicity, to have a news release prepared. Sassen took the information from Stone, wrote up the release, and had it disseminated for general publication in the news media without ever checking the accuracy of the release or the propriety of the sources of its information. The release was then approved for publication by Stone—who knew better—and by Michael Orth, the Branch Chief for Criminal Investigation, who also knew better or at least should have.

Although Stone did not testify in the FTCA case, he stated in a deposition that Powers had approved the publication of the release. But the district court made an explicit finding that Stone lied about obtaining Power's approval.[65] In fact, uncontroverted testimony established that Powers had told Johnson's attorney in a taped telephone conversation credited by the court that if the news release damaged Johnson, he "should sue the hell out of them."[66]

There is no evidence in the record that any of the IRS personnel involved in creating or authorizing the press release checked to see whether the information contained in it appeared in the record of the tax evasion proceedings. Even if an agent tries to comply only with the relaxed standard of *Lampert,* he or she must, at a minimum, verify that the information in the release has been disclosed in the court proceedings or in some other public record.

At trial, Johnson testified, and the court accepted, that during an early meeting he had with an Agent O'Connell, one of the investigators initially assigned to the case, O'Connell candidly told Johnson that

> the only favorable publicity that the Internal Revenue Service can get is when they bring a big one down and he said "your name is a household word to thousands of people" and I [Johnson] said "do you mean to tell me that you think you can take me to a court of law and get a conviction on me with what you have from my records?" He [O'Connell] said, "*probably not, but I can get your name in the newspapers and that will have accomplished*

---

[65]760 F.Supp. at 1229-30.

[66]*Id.* at 1222.

*my purpose.*"[67]

This "trophy hunting" mentality is apparent in the actions of special agent Stone in deliberately procuring the news release through agent Sassen despite Stone's personal knowledge of the anti-publicity provision of the plea agreement. Although both agents must have been aware of § 6103's stern strictures on disclosure of taxpayer information, they consciously effected the release of information coming directly from Johnson's taxpayer record without attempting to determine whether such information was or was not a part of the public record.[68] The protected information was knowingly publicized despite the obviously extreme and comprehensive efforts of the prosecution to keep such details out of the public record during the judicial proceedings, and thus out of public view.

The acts and omissions of the IRS agents directly and proximately caused the statutorily protected information twice to be released to the public at large—the second time *after* Johnson's lawyer vigorously alerted the IRS to the problem. Irrespective of what inevitably might have come out in company and shareholder literature, or even publicly, concerning Johnson's case, the pair of widely disseminated news releases were the first public disclosures of his conviction—publicity that immediately annihilated Johnson's exemplary business career on the eve of achieving its pinnacle. This brings us to the element of causation.

IV

CAUSATION

Causation is the final element of Johnson's tort theories that we must investigate. The government insists that the district court erred in finding that publication of the news releases was the proximate cause of Johnson's damages. We disagree.

We initially note that Johnson's burden was only to establish proximate cause by a

---

[67]*Id.* at 1233 (emphasis added).

[68]Again, we restate that we do not decide whether the presence of information in a public record would shield the release of the information from being a § 6103 violation. We only decide that the wanton disregard of the standard set by § 6103 regarding Johnson's right to privacy vis-a-vis his taxpayer information was at least negligent behavior by Stone and Sassen.

preponderance of the evidence.[69]  As the government points to no evidence that Johnson's damages were *not* caused by the IRS's conduct—or that they were caused by any occurrence other than the acts of the IRS—this is not a difficult burden for him to meet.

On uncontradicted evidence, the trial court found that Mr. Clay (the president and CEO of the company) and several other members of the Board of Directors (albeit not a majority of the Board), had been told by Johnson about his tax troubles and his impending guilty plea.  Nevertheless, on the Monday following the Friday on which Johnson's guilty plea was entered, he was told by Clay that in his (Clay's) opinion it would be best if Johnson would remain with American National.  But, after the press releases appeared, all of that changed.  Clay obviously felt compelled to bring the question of Johnson's continued employment before the full Board of Directors, which in turn requested Johnson's resignation.  The district court found that this, along with other evidence, demonstrated conclusively that the news releases were the proximate cause of Johnson's forced resignation and all job-related and personal losses that followed.

Findings of proximate cause by a district court, like other findings of fact, are reviewed by this court under the clearly erroneous standard.[70]  The district court examined Johnson's record as an American National employee and executive, the nature of his and his wife's tax troubles, the fact that several of the board members had already known about his guilty plea but had not called for his resignation, and the additional fact that Johnson was not asked to resign, even after he pleaded guilty,

---

[69]We note, however, that injury and causation are not elements of an invasion of privacy cause of action under Texas law.  As the Texas Supreme Court held in *Billings v. Atkinson,* 489 S.W.2d 858 (Tex.1973), "the invasion of privacy is a willful tort which constitutes a legal injury." *Id.* at 861.  *See also K-Mart Corp. Store No. 7441 v. Trotti,* 677 S.W.2d 632, 638 (Tex.App.—Houston [1st dist.] 1984), *writ ref'd n.r.e.,* 686 S.W.2d 593 (Tex.1985) ("The basis of a cause of action for invasion of privacy is that the defendant has violated the plaintiff's rights to be left alone.  This intrusion itself is actionable, and the plaintiff can receive at least nominal damages for that actionable intrusion without demonstrating physical detriment.") (citing, inter alia, *Billings* ).

[70]*In re Air Crash at Dallas/Fort Worth Airport,* 919 F.2d 1079, 1085 (5th Cir.) (citing *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), and 53 Tex.Jur.3d, *Negligence* § 129), *cert. denied,* --- U.S. ----, 112 S.Ct. 276, 116 L.Ed.2d 228 (1991).

until the board felt forced to request his resignation following publication of the press releases.[71] Reviewing all of the circumstances leading to Johnson's forced resignation, the district court found that the IRS's releases were the proximate cause of that and all of the disastrous consequences that flowed from it. After our own detailed review of the record and of the district court's findings and reasoning, we are not prepared to say that the court's finding of proximate cause is clearly erroneous.

A. *Duty to Disclose*

In its simultaneous petition for rehearing and suggestion for rehearing en banc, the government claims—for the first time before any court—that there was no but-for causation because Johnson's conviction would eventually have to be disclosed in a footnote to American General's annual report. Obviously, the government picked that up from Judge Garwood's dissent, which stated: "Moreover, the evidence is *undisputed* that the whole board and all the stockholders of this large, publicly held company, the stock of which was publicly traded, would have had to have been informed, even if there had never been any press release whatever."[72] Judge Garwood further expanded on this argument in a footnote: "And we also know as a matter of common knowledge that this information would likewise have to be disclosed to the SEC, where it would be a matter of public record, and to the investment community."[73] But, neither Judge Garwood nor the government ever specify what statute, what regulation, or what common law principle would mandate that this information be disclosed. Neither was this argument advanced in the district court or on direct appeal to this court, either in briefs or oral argument.

The government vaguely implied at trial that Johnson had a duty to disclose his conviction to the board, and that the board, in turn, had a duty to disclose the conviction to the shareholders. The

---

[71]We are not in a position to speculate what information would have been omitted from the press release to cause a different result (what information was critical to damage Johnson). It is at least within the realm of possibility that if a press release had been issued containing only the information agreed to with Powers *or* only the information that appeared in the court record, the same result might have occurred. Surely, however, it was not beyond reason for the court to have found that the protected information that was included in the release, coupled with other public information, caused the damage to Johnson.

[72]*Johnson v. Sawyer,* 980 F.2d at 1512 (Garwood, J., dissenting).

[73]*Johnson v. Sawyer,* 980 F.2d at 1513 n. 15.

government never directly claimed, however, that such disclosure to the shareholders would have automatically triggered Johnson's fall from grace. Neither did it adduce any evidence to support such a theory. The district court had to make a real stretch just to infer such an argument from the government's vague implications.[74] Still, the court rejected it soundly:

> The essence of the Government's position is that Johnson was obligated to inform the board of directors of his conviction, and that the board would have been obligate to discharge him. The government *has produced no authority* to back up the first assertion....
>
> [T]he government *has not convinced us* either that the board would have been obligated under Texas law to discharge him, or that it would have discharged him for the sake of propriety....
>
> We cannot believe that a reasonable investor who knew all the circumstances behind Johnson's conviction would attach any importance to it; hence *there can be no question of duty of disclosure....*
>
> Finally, the Government argues that Johnson had a duty as a fiduciary to disclose his conviction to the board of directors. The case[s] it cites in support of this position, however, *say nothing of the sort.*[75]

The government acknowledged these holdings in its brief on appeal: "The District Court also found that Johnson was not obligated to advise the entire board of directors of a major, publicly held insurance company that he had been convicted of a federal felony."[76] Yet, despite acknowledging this adverse ruling, the government made *no* argument that it was incorrect. Neither did the government's reply brief on appeal advance an argument that there was a duty to disclose the conviction either to the board or the shareholders.

The first time during the entire trial and appellate process that anyone claimed that there was a duty to publicize Johnson's tax problems was in Judge Garwood's dissent. With all due respect to Judge Garwood, after we carefully re-read the district court's opinion and the government's briefs, we are unable to verify his statements regarding the state of the record and a duty to disclose. The

---

[74]*See* 760 F.Supp. at 1230 ("Behind the government's rather cryptic discussion of *Kirk* and *Huett may* lurk the idea that the board would have had to fire Johnson because his conviction was a material fact, the failure to disclose which would have placed the company or some of its personnel, in violation of blue sky laws....") (emphasis added).

[75]*Id.* at 1230-31 (emphasis added).

[76]*Government's Brief on Appeal* at 43.

record is simply devoid of any evidence of this kind.

On appeal, the government never raised the argument that there was a duty to disclose or that publication was inevitable, much less that disclosure or publication to shareholders would, ipso facto, cause Johnson's downfall. It did so for the first time in its petition for rehearing and suggestion for rehearing en banc, *only* after Judge Garwood "argued" that issue for the government in his dissent. Even now, the government cites *no* statute or regulation in support of this argument. Instead, the government attempts to imply that the panel already found such a duty to exist. The petition for rehearing states:

> Although the Court found as a fact that the publicity resulting from the press releases caused Johnson to lose his job [citing 980 F.2d at 1512], it also recognized that Johnson's conviction would have had to have been reported to the entire board of the company, and would have been included in company and shareholder literature, regardless of the press releases [citing 980 F.2d at 1498].[77]

In almost identical form, the suggestion for rehearing en banc claims:

> The panel attempts to skirt this issue by finding as a fact that the publicity resulting from the press releases caused Johnson to lose his job [citing 980 F.2d at 1512]. But it recognized that Johnson's conviction would have had to have been reported to the entire board of the company, and would have been included in company and shareholder literature, regardless of the press releases [citing 980 F.2d at 1498].[78]

The only statement on this page of the original panel opinion that even remotely supports the government's position reads:

> Irrespective of what inevitably *might have come out* in company and shareholder literature, or even publicly, concerning Johnson's case, the pair of widely disseminated news releases were the first public disclosures of his conviction—publicity that immediately decimated Johnson's exemplary business career.[79]

This is hardly the concession that the government claims it is.

In conclusion, we must seriously question whether such a disclosure duty can be found to exist in this case, in light of: 1) The district court's finding that there was no duty to disclose (after examining the cases cited by the government at trial and sua sponte researching the securities laws

---

[77]*Government's Petition for Rehearing* at 11.

[78]*Government's Suggestion for Rehearing En Banc* at 14.

[79]980 F.2d at 1498 (emphasis added).

implicated in those cases); 2) the government's failure to argue on appeal that such a duty existed until prompted to do so by Judge Garwood's dissent; 3) the government's failure to cite *any* authority for its position; and 4) Judge Garwood's exclusive reliance (prior to his present dissent) on "common knowledge" for the existence of such a duty.

Only in his instant dissent does Judge Garwood cite any authority for the existence of such a duty.[80] The regulat ions cited by Judge Garwood may in fact require disclosure of a criminal conviction *if* such a co nviction were "material to an evaluation of the ability or integrity of any ... executive officer."[81] The district court, however, expressly found t hat the information regarding Johnson's conviction was not material, and as such did not have to disclosed.[82] "Only if the

---

[80]*See* dissent, slip opinion at 411 n. 9. (citing 17 C.F.R. § 229.401(f)). Although we share Judge Garwood's concerns for the effect of "legal inventiveness" on the rule of law (*see* Dissent, slip opinion at 407), we decline the opportunity to comment further on that issue at this point.

[81]17 C.F.R. § 229.401(f).

[82]760 F.Supp. at 1230. The dissent claims to perceive a distinction between the meanings of the term "material" as used in the Texas Securities Statute (Tex.Rev.Civ.Stat.Ann. art. 581-29(C)) and in the SEC regulation (17 C.F.R. §§ 229.401(f), 240.13a-1). Dissent, slip opinion at 417 n. 14 (characterizing the SEC requirement as "distinctly different" and "narrower"). We perceive no inherent distinction in meaning assigned to this term and neither the parties nor the dissent point to any cases making such a distinction. To the contrary, the existing case law strongly suggests that this term is defined identically in both the Texas statute and in the SEC regulations.

 The district court defined a fact as material "if a reasonable investor would consider it important in deciding whether to invest." 760 F.Supp. at 1230 (citing *Huett v. State,* 672 S.W.2d 533, 540 (Tex.App.—Dallas 1984, pet. ref'd); *Kirk v. State,* 611 S.W.2d 148, 151 (Tex.Civ.App.—El Paso 1981, no writ)). In turn, these cases both defined a fact as material if "there was a substantial likelihood that a reasonable investor would have considered it important in deciding whether or not to invest." *Huett,* 672 S.W.2d at 540; *Kirk,* 611 S.W.2d at 151. Both Texas courts used verbatim the definition of "material" established by the United States Supreme Court when it addressed the meaning of that term in the context of the Securities Exchange Act and the SEC regulations promulgated thereunder. *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)

 In *TSC Industries,* the Court defined a fact as material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Id.* at 449, 96 S.Ct. at 2132. "Put another way, there must be a substantial showing that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix' of information made available." *Id.* In so defining this term, the Court expressly rejected a less stringent definition under which material facts would include "all facts which a reasonable shareholder *might* consider important." *Id.* at 445, 96 S.Ct. at 2130; *see also Basic, Inc. v. Levinson,* 485

established omissions are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality' is the ultimate issue of materiality appropriately resolved "as a matter of law' ..."[83] Further, the government did not appeal the determination that Johnson's conviction was not material; it therefore waived any error in that holding.

More importantly, even if we were to concede solely for the sake of argument that the fact of Johnson's plea agreement and conviction would of necessity be disclosed in company notices or reports, nothing of "common knowledge," much less record evidence supplies the "quantum leap" that such disclosure would have ended Johnson's career. "Proximate cause cannot be established by mere guess or conjecture, but rather must be proved by evidence of probative force."[84] Neither can the government successfully rebut Johnson's probative evidence of proximate cause by mere guess or speculation; yet that is the only kind of "evidence" that the government proffered to the district court in support of this argument.[85] Moreover, the government's attempt to rebut Johnson's evidence

U.S. 224, 232, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988) (expressly adopting "the *TSC Industries* standard of materiality for the § 10(b) and Rule 10b-5 context."). This court is of course bound by the decisions of the United States Supreme Court regarding the interpretation of federal statutes and regulations.

As the Texas courts' definition of the term "material" (in the relevant statutes) is identical to the Supreme Court's definition (in the relevant statutes and regulations), we can find no supportable basis for the dissent's claimed definitional distinction.

[83]*TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

[84]*McClure v. Allied Stores of Texas, Inc.,* 608 S.W.2d 901, 903 (Tex.1980).

[85]*See* 760 F.Supp. at 1230-31 ("We place no value on the Government's *speculation* that the board would have fired Johnson anyway; on the contrary ... we think it most unlikely.") (emphasis added). We agree with the dissent that neither can Johnson rely on mere speculation or conjecture to support a finding of causation. Nonetheless, the quality and quantity of evidence presented by Johnson far exceeds that presented by the plaintiff in *Nichols Construction Co. v. Cessna Aircraft Co.,* 808 F.2d 340 (5th Cir.1985), the case relied on by the dissent for this point. In *Nichols,* a private plane crashed into the sea; both occupants were killed and neither their bodies nor any portion of the wreckage was ever recovered. *Id.* at 347. The plaintiff theorized that the crash was caused by a defective component in the airplane. From among the 15,000 such components that had been manufactured, only 27 defective ones had ever been found. *Id.* at 347 n. 15. There was no evidence that a defective component had ever escaped inspection and been installed in an aircraft. *Id.* at 347 & n. 15. Similarly, there was no evidence that such a component would fail after installation in an aircraft. *Id.* Neither was there any evidence that any airplane had ever experienced any problems due to such a defective component. *Id.* The only evidence presented by the plaintiff concerning causation was the testimony of an "expert" witness.

of proximate cause has additional flaws which we discuss in the following sections.

B. *Publication and Publicity*

Again, even if we assume arguendo that Johnson's tax evasion conviction would eventually have been disclo sed in the company's annual report, the government's argument, as advanced by Judge Garwood, ignores the black letter law elements of a cause of action for public disclosure. As stated above: " "Publicity' requires communication to more than a small group of persons; the matter must be communicated to the public at large, such that the matter becomes one of public knowledge."[86] The "publication" of Johnson's conviction in a footnote of an annual report, not likely to be read by any significant number of the general public (but rather only by shareholders and a few financial analysts) is not "publicity"; two press releases to at least twenty-one newspapers of general circulation is.

Moreover, if anything about this issue qualifies as "common knowledge" it is that the public relations professionals who craft corporate reports always put the most favorable possible spin on the ball. With management's desire to keep Johnson on board as the heir apparent to the CEO-ship, specific efforts to candy-coat and bury this information would have been considerably "kinder and gentler" than the cold blast in the IRS release, and almost certainly undamaging.

Second, the government argues that the differences between the press releases actually made and press releases that would not be actionable under the court's opinion are so minimal that the mere inclusion of the prohibited information could not have caused Johnson's injuries. This argument might conceivably be persuasive if Johnson had an unusual last name, lived in a small community, or worked for a small company. But none of these elements are present in the factual background of the instant case.

---

*Id.* at 347 n. 16. Yet, this witness had no firsthand knowledge of or experience with the component in question and "did not draw his own expert opinion based on an independent analysis of the evidence so much as he relied on his impression or interpretation of the conclusions of others as expressed in unidentified documents and depositions." *Id.* at 351. As the witness's relevant conclusions were not based on his own expertise, the court held that they did not furnish substantial evidence to support a finding of causation. *Id.* at 351-52 n. 22.

[86]*Industrial Foundation,* 540 S.W.2d at 683-84.

To the contrary, Johnson is one of the most common last names in America—less common than "Smith," but more common than "Jones." Also, as evidenced by facts of this case, many persons use a middle name or nickname instead of their full, given first name. In those instances, such persons' given names simply are not recognizable. Further, many telephone book listings are by last name and first initial or by first name and middle initial. Thus those attempting to determine which "Elvis Johnson of Galveston" had pleaded guilty could never have succeeded had they looked only for "Johnson, Elvis" or "Johnson, E." in the Galveston phone book. But, by publicizing Johnson's full name, Elvis E. Johnson—which did not appear anywhere in the court record—the IRS made it much easier for the curious to identify him.

An even stronger argument applies to the fact that the IRS gave Johnson's home address. Giving that address makes it all the easier positively to identify him from the pool of all Johnsons living in Galveston. Additionally, this information considerably narrowed the initial pool that an inquiring mind would have to examine. Identifying Johnson as "of Galveston" does not specify whether his residence or place of employment is in Galveston. Further, individuals may well identify themselves as "of" a given city when they either reside or work in a different nearby community. A multitude of smaller communities exist between Houston and Galveston, many of which are likely not included in the Galveston phone book.

Finally, even though the bill of information charging Johnson identified him as "of Galveston," no court documents contain a street address for him there or specify that that is where he lived, where he worked, or both. All court documents that required a street address for Johnson gave his as 1100 Milam Street, Houston, Texas. This was in fact the address of Johnson's attorney, used deliberately by Johnson and the government. If the IRS agents had properly sought to use the most specific information legally available for its press release, i.e., that in the court records, they would have been restricted to using the Milam Street address in Houston. This would have accomplished the purpose of the plea arrangement by virtually eliminating any chance for curiosity seekers to identify Johnson as the tax evader. Houston is no doubt home to hundreds if not thousands of Johnsons and *not* home to our Johnson. Ironically, using the Houston address would have gotten just as much deterrent

publicity for the IRS—maybe more, given Houston's large population and concentrated media market.

The identification of Johnson as an "executive vice-president" probably would not equally ease the burden of a stranger attempting to locate the tax evader, but it certainly would positively identify him to his numerous personal and business acquaintances. The inclusion of Johnson's age in the press release would similarly help to confirm his identity as the subject of that release to such acquaintances.[87]

C. *Actual Causation*

The cornerstone of the government's argument that the press releases did not cause Johnson's injuries is the idea that these injuries eventually would have occurred even in the absence of its

---

[87]The dissent makes much of the "obvious fact that neither a middle initial, age, a street address, nor a job title fall within [the] classification [of facts that are private and contain highly intimate or embarrassing facts]." So far as it goes, this characterization is true. Contrary to the dissent's claim, we are concerned with the "publication *merely* of the [above] four facts." (Emphasis added) Johnson's cause of action is not based on the IRS's disclosure of these discreet facts in a vacuum; rather it is the context in which these facts were disclosed that renders the IRS's actions tortious.

The dissent minimizes the significance that the majority accords to the context in which the IRS released the protected information. But context truly can be everything. Take as an example the hypothetical case of Jane Doe, who acquired AIDS through a blood transfusion, and who wishes to keep this fact private. Clearly, the local paper can print a story proclaiming that AIDS is a horrible, debilitating disease without invading Jane Doe's privacy. It can also print a separate story that a local, unidentified resident suffers from this disease. Finally, it can print a third, unrelated story that Jane Doe is 30 years old, lives at 123 Main Street, and is an executive vice president with the Acme Insurance Company without invading her privacy (assuming of course that these facts are "open to the public eye"). Yet just as clearly, the paper would actionably invade Jane Doe's privacy if it were to combine these same elements into a single story: "Jane Doe, 30 years old, of 123 Main Street, an executive vice president with the Acme Insurance Company has AIDS, a horrible, debilitating disease."

Although the instant case may not be as obvious as Jane Doe's, it plainly was the inclusion of the protected details in the IRS release that snatched Johnson from the relative anonymity of being but one of thousands of Johnsons in Houston, and unambiguously identified him as the person convicted of tax fraud.

A similar example exists in the case of a sexual assault victim who elects to use a pseudonym in all police and court records. *See* Tex.Code Crim.P.Ann. art 57.02 (West 1993). Once such a person opts to use a pseudonym, the world is not generally prohibited from using his or her real name and address; instead it is only prohibited from using such information in the limited context of identifying him or her as the victim of the sexual assault.

tortious conduct. This smacks of a veiled attempt to analogize the instant circumstances to the "inevitable discovery" rule applicable to Fourth Amendment search and seizure cases. But no such "inevitable harm" rule exists in the realm of tort law.

Moreover, even if we were to concede arguendo that the company would have eventually had to disclose Johnson's tax problems, and further concede arguendo that such disclosure would have some deleterious effect on Johnson's career, the company publicity would not have occurred until months after the IRS new releases had appeared; would have been buried in some footnote, we suspect; would have been rationalized in "PR-speak"; and would have had a much smaller and select circulation than the aggregate general circulation of 21 newspapers, plus any television pickup that might have ensued. Moreover, a tortfeasor can still be held liable for the consequences of his actions, even if he is not the sole cause of the resulting harm. The rule on this matter is clear under Texas law:

> Cause if fact means that the act or omission was a *substantial factor* in bringing about the injury and without which no harm would have occurred. Where failure to use ordinary care actively aids in producing an injury as a direct and existing cause, it need not be the sole cause, but it must be a *concurring cause* and such as might reasonably have been contemplated as *contributing to the result* under the attending circumstances.[88]

Even if we again assume that Johnson's conviction would have to have been disclosed eventually in the company's annual report, the government cannot contend, other than disingenuously, that its press releases still would not have been a substantial factor contributing to Johnson's damages or that those damages could not reasonably have been contemplated by the IRS agents making the press releases.

D. *Specific Findings of Fact*

The government also argues, at least implicitly, that Johnson had the burden of securing specific findings of fact that the proscribed portions of the press releases were the cause of his damages. Yet the government points to no such request for specific findings made on its part. Albeit true that requests for specific findings are not necessary for purposes of review, neither are they essential to the validity of a judgment.[89] Additionally, either party may move the court to amend or

---

[88]*McClure v. Allied Stores of Texas, Inc.,* 608 S.W.2d 901, 903 (Tex.1980) (emphasis added).

[89]Fed.R.Civ.P. 52(a).

make additional findings of fact once the judgment is rendered.[90] Here neither party did so. We find this to be a non-issue.

In its petition for rehearing and suggestion for rehearing en banc, the government advances an argument on the issue of causation that is wholly specious. The government claims: "The district court, however, treated the *entire* press release as being proscribed by Section 6103 [citing Judge Garwood's dissent, 980 F.2d at 1512]."[91] In its enthusiasm to embrace Judge Garwood's dissent, the government ignores the clear implication of the actual opinion of the district court, which reads: "Plaintiff correctly states that, contrary to the Government's belief, we did *not* hold in our earlier opinion that all IRS news releases about conviction violate § 6103."[92]

E. *Clearly Erroneous Rule*

The government similarly attempts to twist our original opinion's expression concerning the effect of the clearly erroneous rule on our review of this case into a confession of misapprehension of the "but-for" test for causation:

> The fact that the [Fifth Circuit panel] noted that it was conceivable that the same result might have occurred even if the press release had not contained information proscribed by Section 6103 underscores the point that it failed to apply the "but for" test required under Texas law [citing 980 F.2d at 1500 n. 41].[93]

The actual text of the footnote at issue reads:

> We are not in a position to speculate what information [c]ould have been omitted from the press release to cause a different result (what information was critical to damage Johnson). It is at least conceivable that if a press release had been issued containing only the information agreed to with Powers *or* only the information that appeared in the court record, the same result might have occurred. Surely, however, it was not beyond reason for the court to find that the confidential information that was released caused the damage to Johnson.[94]

If the government would but refer to Rule 52 of the Federal Rules of Civil Procedure, it would see that the rule provides in part: "Findings of fact, whether based on oral or documentary evidence, shall

---

[90]Fed.R.Civ.P. 52(b).

[91]*Government's Petition for Rehearing* at 10.

[92]760 F.Supp. at 1230 n. 12.

[93]*Government's Petition for Rehearing* at 10.

[94]980 F.2d at 1500 n. 41.

*not* be set aside *unless clearly erroneous,* and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."[95]  We can find no authority for the government's implicit proposit ion that findings of fact *must* be overturned *if* a contrary finding would be "conceivable."[96]

V

PREEMPTION

The government asserts that the remedial structure of § 7217[97] of the Internal Revenue Code preempts the FTCA for resolution of claims such as Johnson's.  The government cites no direct authority for this proposition but relies by analogy on our holding, in *Rollins v. Marsh,*[98] that the FTCA was preempted by the Civil Service Reform Act of 1978 (CSRA).[99]  The government's reliance on *Rollins* is misplaced.  There, we acknowledged that, to preempt the FTCA, new legislation must specify comprehensive remedies that unmistakably provide the *exclusive* method for resolving controversies of the type covered by the legislation.[100]  In so acknowledging, we agreed with the conclusions reached earlier by the Eighth and Ninth Circuits that the remedial provisions of the CSRA were sufficiently comprehensive *and exclusive* to preempt the FTCA.[101]

We are convinced, however, that even though § 7217 may be comprehensive, it is *not* also

---

[95]Fed.R.Civ.P. 52(a) (emphasis added).

[96]If our criticism of the government's mischaracterization of our original opinion seems harsh consider that *no* citation to Fed.R.Civ.P. 52 can be found in either the government's Petition for Rehearing or its Suggestion for Rehearing En Banc.  There are only two reference to this rule in the government's Brief on Appeal and neither relates to this aspect of the rule:  "This court has held that an award of damages may reversed where it is clearly excessive.  Fed.R.Civ.P. 52(a)." *Government's Brief on Appeal* at 44.  "In all actions tried without jury, the trial court must make specific findings of fact and conclusions of law.  Fed.R.Civ.P. 52(a)." *Id.* at 48.  In a case as fact dependent as the instant one, Rule 52 plays a pivotal role in the subsequent appellate review.

[97]26 U.S.C. § 7217, which was in effect at the time this action arose, was replaced by § 7431.

[98]937 F.2d 134, 139-40 (5th Cir.1991).

[99]Pub.L. No. 95-454, 92 Stat. 1111 (codified as amended at 5 U.S.C. § 1101 *et seq.* (1988)).

[100]*Rollins,* 937 F.2d at 139.

[101]*Id.;  see Rivera v. United States,* 924 F.2d 948, 951-52 (9th Cir.1991);  *Premachadra v. United States,* 739 F.2d 392, 393-94 (8th Cir.1984).

exclusive. Unlike the CSRA, which creates a cohesive system for the redress of civil servants' employment problems, § 7217 merely provides remedies for violations of § 6103; nowhere does Congress purport to make § 7217 preemptive of the FTCA.

The Supreme Court instructs: "When considering preemption, "we start with the assumption that the historic police powers of the States were not be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' "[102] The government fails to cite to this court any evidence that Congress intended for § 7217 to be the exclusive remedy for each and every § 6103 violation.[103] Instead, the government makes the bare claim that: "The legislative history of Section 7217 reveals that Congress believed that it was creating a remedy *where none existed.*"[104] An examination of the Senate Report cited by the government not only fails to support this proposition but instead demonstrates the contrary.

Under the heading of "Reason for change" the report states: "The committee decided that the present provisions designed to enforce the rules against improper use or disclosure of returns or return information are inadequate [*not non-existent* ]."[105]

Admittedly, the report states: "The committee also decided to establish a civil remedy for any taxpayer damaged by an unlawful disclosure of returns or return information."[106] But the remainder of the paragraph clarifies this statement.

The cause of action would *extend* to *any* disclosure of return or return information which is

---

[102]*Wisconsin Public Intervenor v. Mortier,* --- U.S. ----, ----, 111 S.Ct. 2476, 2482, 115 L.Ed.2d 532, 543 (1991) (quoting *Rice v. Santa Fe Elevator Co.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)).

[103]It is true that § 7217 is comprehensive in terms of allowing actions for breaches of § 6103. This court, however, must recognize the significant distinction between "comprehensive" and "preemptive." *Rollins* and other authorities instruct us that we must have some evidence of congressional intent before we hold that an enactment *preempts* the FTCA. In this case, no such evidence of intent has been cited to this court, and our independent research reveals none. We are thus unprepared to say that a statute that allows for recovery for all § 6103 violations clearly evidences congressional intent to *preempt* the FTCA.

[104]*Government's Petition for Rehearing* at 7 (emphasis added).

[105]S.Rep. No. 94-938 at 347, U.S.Code Cong. & Admin.News, 1976, pp. 2897, 3777.

[106]*Id.* at 348.

made in violation of section 6103.... Because of the difficulty in establishing in monetary terms the damages sustained by a taxpayer as the result of the *invasion of privacy* caused by an unlawful disclosure of his returns or return information, the amendment provides that these damages would, in no event, be less than liquidated damages of $1,000 for each disclosure.[107]

Clearly Congress recognized that the disclosure of tax return information implicates an invasion of privacy cause of action. The purpose of § 7217 is more properly described as easing the burden of a taxpayer whose privacy has been invaded in proving the quantum of his damages.

Neither is the claim of preemption supported by *Boyle v. United Technologies Corp.,*[108] which discussed preemption, not because the federal statute occupied the field, but because the state and federal law were in conflict. In *Boyle,* the Supreme Court noted that if the laws in question concern a field which the states have traditionally occupied, preemption can only be found if the state and federal laws directly or sharply conflict.[109] On the other hand, if the field is one of "uniquely federal interest," preemption can occur even if the conflict is more attenuated. Under such circumstances, preemption can occur if "a significant conflict exists between an identifiable federal policy or interest and the operation of state law," or if "the application of state law would frustrate specific objectives of federal legislation."[110]

We note that tort actions for invasion of privacy are a field which the states have traditionally occupied. As such, we could only find preemption if the state and federal laws at issued sharply conflicted. As we perceive *no* conflict whatsoever between the instant state and federal laws, the Texas common law is not preempted. Even if the subject matter of the instant suit were one of "uniquely federal interest" (which it is not), there is no conflict between the identified federal policy or interest behind §§ 6103, 7217 and the operation of Texas common law. As previously stated, the federal policy underlying those provision was to expand invasion of privacy causes of action for the release of tax return information and rectify the "difficulty in establishing in monetary terms the

---

[107]*Id.* (emphasis added).

[108]487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988).

[109]*Id.* at 504, 507, 108 S.Ct. at 2514, 2516.

[110]*Id.* at 507, 108 S.Ct. at 2516 (internal quotes, cites, and brackets omitted).

damages sustained by a taxpayer as the result of the invasion of privacy."  Likewise, the application

of Texas common law in this field does not frustrate "specific objectives of federal legislation."

The government also relies on language from *El Chico v. Poole* to suggest that Texas would

not recognize a negligence per se action based on any statute that also provided a statutory remedy.[111]

What the government conveniently fails to mention is the actual language of the Texas statute

discussed in *Poole.*  Section 2.03 of the Texas Alcoholic Beverage Code, entitled "Statutory Remedy"

provides:  "This chapter provides *the exclusive* cause of action for providing an alcoholic beverage

to a person 18 years of age or older."[112]  This language is crucial to the determination that § 2.03

preempts a common law dramshop cause of action.  As stated by the Dallas Court of Appeals:  "[T]he

legislature meant what it said when it set forth the *exclusive* cause of action for providing alcohol to

an intoxicated person 18 years of age and older."[113]  No such statement (or even implication) of

exclusivity can be found in § 7217 or in its legislative history.  We hold that Johnson's right to sue

the government under the FTCA for a recognized Texas tort, the relevant standard of conduct for

which is stated in § 6103, is not preempted by § 7217.

The balance of the affirmative defenses presented by the government were fully addressed in

the first panel opinion.  We perceive no need to repeat that discussion here.

VI

CONCLUSION

Upon further reflection following the issuance of our original opinion in this case, we are now

convinced that the district court erred in not holding for Johnson on his invasion of privacy cause of

---

[111]*Government's Petition for Rehearing* at 6 n. 4 ("[T]he Texas Supreme Court has indicated that Texas courts would not apply a negligence per se theory to create a remedy for the breach of a statute that provides for its own remedy."); *Judge Garwood's Dissent* at 1510 n. 9.  ("The plain implication of *Poole* is that the statutory cause of action would be exclusive of any court-created action under a negligence per se theory with respect to statutory violations occurring after the legislation went into effect.").

[112]Tex.Alco.Bev.Code § 2.03 (emphasis added).

[113]*Sewell v. Smith,* 819 S.W.2d 565, 567 (Tex.App.—Dallas 1991, writ granted) (citing *Boyd v. Fuel Distributors, Inc.,* 795 S.W.2d 266 (Tex.App.—Austin 1990, writ denied)) (emphasis added).

action.  Were it necessary, we would reverse and render on that theory.  But that ruling of the district court does not require reversal because the district court correctly held for Johnson on his negligence cause of action and awarded damages based on that cause of action.

We do realize, however, that the district court did err (as did we originally) in stating that § 6103 created a duty when it actually only established a standard of conduct relevant to a duty that has an independent existence.  The duty to which the government is subject has it basis in Texas common law.  That duty is the same for the government as any other person—to act reasonably under the circumstances.  In Texas, one reasonable person does not improperly publicize embarrassing or damaging private facts about another person.

We conclude also that this established state law tort implicates the FTCA's waiver of sovereign immunity, thus exposing the government to potential liability.  We reiterate our affirmance of the district court's adoption of § 6103 as establishing an appropriate standard of care under the circumstances of the instant case for purposes of Johnson's claim grounded in negligence per se.  We likewise reaffirm the court's rejection of the various FTCA exceptions proffered in defense by the government, as well as the court's finding that the actionable negligence of the IRS agents in promulgating the two news releases was the proximate cause of the Johnsons' damages.

With the exception of Johnson's pension losses—which we have recalculated—the district court's determination of Johnson's special damages are not clearly erroneous.  But, for the reasons set forth in our original opinion, we reaffirm our remand of this case for the limited purpose of affording that court the opportunity to explain its methodology in calculating Johnson's damages emotional distress and mental anguish, or alternatively, to recalculate those damages and explain its recalculation sufficiently to permit appellate review.

For the foregoing reasons—and to the extent not inconsistent herewith, for the reasons set forth in our original panel opinion—the judgment of the district court is AFFIRMED in part; MODIFIED in part and, as thus modified, RENDERED in part;  and REMANDED in part.


GARWOOD, Circuit Judge, dissenting:

I continue to dissent because, for the reasons explained in my prior opinion, *Johnson v. Sawyer,* 980 F.2d 1490 at 1506 *et seq.* (5th Cir.1992), recovery herein is based on federal, not Texas, law, contrary to the Federal Tort Claims Act (FTCA), and no material damage proximately resulting from the violation of 26 U.S.C. § 6103 has been shown.

The majority opinion is a monument to the frailty of the rule of law when subjected to an unrelenting assault of legal inventiveness and verbal facility. The initial majority opinion, though conceding that in the abstract a violation of federal law would not suffice for FTCA recovery, nevertheless found that a violation of section 6103 could be brought within the FTCA by virtue of the general Texas doctrine of negligence *per se.* The majority now purports to abandon that position, seemingly recognizing that it merely invokes federal law under another name, as the duty relied on is actually found only in section 6103. The majority now claims to fill that local law void by, *sua sponte,* asserting that the relevant duty is that imposed by the Texas common law tort of invasion of privacy, more particularly the "distinct" variety thereof that establishes the duty to refrain from "public disclosure of embarrassing private facts about" another.[1] *Industrial Foundation of the South v. Texas Industrial Accident Board,* 540 S.W.2d 668, 682 (Tex.1976). Closer reading of the majority opinion, however, reveals its proper acknowledgement that nothing which was disclosed—however otherwise culpable the disclosure—constituted "embarrassing private facts about" Johnson for purposes of this Texas common law tort. In other words, Texas law imposed no duty not to disclose such information. The majority now fills this gap in local law—just as it did before—by resort to section 6103. The pea gets lost for awhile, but ultimately turns up under shell 6103. Simply put, this is a section 6103 suit—more properly a suit under former section 7217[2]—and not one under Texas law. Dressing it up as "negligence *per se* " or "invasion of privacy" does not make it otherwise.

The disclosure

---

[1] This theory was rejected by the district court. *Johnson v. Sawyer,* 750 F.Supp. 1216, 1232 (S.D.Tex.1991). Appellee has never before this Court challenged that determination of the district court or sought to sustain the judgment below on the basis of any Texas invasion of privacy tort.

[2] 26 U.S.C. § 7217, the text of which is set out in the previous dissenting opinion. *Johnson,* 980 F.2d at 1509-10.

The majority, assuming *arguendo* the correctness of the decision in *Lampert v. United States,* 854 F.2d 335, 338 (9th Cir.1988), *cert. denied,* 490 U.S. 1034, 109 S.Ct. 1931, 104 L.Ed.2d 403 (1989), bases its affirmance solely on the disclosure of information not made public in the proceedings of Johnson's criminal conviction and sentence.[3]  The majority describes this information as follows:

> "True, several items contained in the press releases (Johnson's first and last name, the guilty plea to one count of tax evasion, the sentence imposed, and the fact that he was an executive with American National) were part of the trial record.  But several other items contained in those releases (Johnson's middle initial—he was known as "E.E.,' his age, his home address in Galveston, and his official job title with American National) were neither discussed at his arraignment nor sentencing or placed in any public record."  (majority, slip opinion at 394; footnote omitted).[4]

What we are considering, then, is publication merely of the following four facts:  (1) that plaintiff's middle initial was "E" (the criminal information charged "Elvis Johnson, a resident of Galveston,");  (2) that his street address in Galveston was "25 Adler Circle";  (3) that he was fifty-nine years old;  and (4) that his executive position with American National Insurance Company was executive vice president.[5]  Although the majority amazingly, and without explanation, refers to these four items as "the truly significant portions of the released information," it is nevertheless plain

---

[3]*See also William E. Schrambling Accountancy Co. v. United States,* 937 F.2d 1485, 1488-89 (9th Cir.1991), *cert. denied,* --- U.S. ----, 112 S.Ct. 956, 117 L.Ed.2d 123 (1992).  I am in essential agreement with *Lampert.  See Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 494, 95 S.Ct. 1029, 1046, 43 L.Ed.2d 328 (1975) (the First Amendment prohibits imposition of "sanctions on the publication of truthful information contained in official court records open to public inspection");  *Innovative Database Systems v. Morales,* 990 F.2d 217, 221-22 (5th Cir.1993) (Texas law unconstitutional to the extent it prohibits sale of truthful motor vehicle accident information obtained from the public records of a law enforcement agency);  *United States v. Wallington,* 889 F.2d 573, 576 (5th Cir.1989) (construing narrowly non-disclosure provisions of 18 U.S.C. § 1905);  *Ross v. Midwest Communications, Inc.,* 870 F.2d 271 (5th Cir.1989).

[4]The initial press release also contained a misdescription of the charges contained in the criminal information.  The majority does not rely on this, and properly so, for two reasons.  In the first place, it is not "return information" under section 6103;  and, while it would be actionable under Texas libel law, it is not under the FTCA.  28 U.S.C. § 2680(h).  In the second place, Johnson was not terminated until several days after the second press release, which corrected this error, and there is no evidence that anything contained in the first release, but not in the second, had any relationship to his termination.

[5]At sentencing in open court the district judge advised Johnson that his probation would be administered so it "will not interfere with the performance of your duties in your position as an executive for the American National Insurance Company, and this, of course, will allow you to travel."

that *none* of them come even close to meeting the core requirement of the Texas tort sought to be invoked, namely that the publicized information be "private" and "contain highly intimate or embarrassing facts about a person's private affairs, such that its publication would be highly objectionable to a person of ordinary sensibilities." *Industrial Foundation,* 540 S.W.2d at 683.[6]

The obvious fact that neither a middle initial, age, a street address, nor a job title falls within that classification is readily confirmed by reference both to the authorities and to the evidence in this case. Texas invasion of privacy law in this respect has been guided by Prosser, *Law of Torts* § 117 (4th ed. 1971) and *Restatement (Second) of Torts,* § 652D. *See Industrial Foundation,* 540 S.W.2d at 682 & n. 21, 684 & n. 22; *Gill v. Snow,* 644 S.W.2d 222, 224 (Tex.App.—Ft. Worth 1982, no writ). Prosser, *supra,* states " "[t]he plaintiff cannot complain when an occupation in which he publicly engages is called to public attention or when publicity is given to matters such as the date of his birth....' " *Id.* § 117 at 858. An individual "must expect the more or less casual observation of his neighbors and the passing public as to what he is and does" and thus there is no liability for publicizing "that he has returned home from a visit, or gone camping in the woods, or given a party at his house for his friends." *Id.* at 857. The *Restatement (Second) of Torts,* § 652D, comment *b,* is to the same effect, *viz*: "[t]here is no liability for giving publicity to facts about the plaintiff's life ... such as the date of his birth ... [o r] the fact that he is admitted to the practice of medicine or is licensed to drive a taxicab ..." and "there is no liability for giving further publicity to what the plaintiff himself leaves open to the public eye." *Id.* at 385, 386. *See also Hubert v. Harte-Hanks Texas Newspapers, Inc.* 652 S.W.2d 546, 551 (Tex.App.—Austin, 1983, n.r.e.) ("We do not regard the candidates' names to be facts of a highly embarrassing or intimate nature"); *Vandiver v. Star-*

---

[6]Because the only claimed relevance of these four facts is their enhancement of the identification of the plaintiff as the person whom the press release legitimately otherwise described as Elvis Johnson, an American National executive convicted of tax fraud, and because there is nothing otherwise intimate or embarrassing about these four facts, I now have grave doubts that section 6103 prohibited their inclusion in the challenged press releases about Johnson's conviction. This doubt arises not only from *Lampert* and its direct progeny, but, more generally, from *Cox Broadcasting Corp.* and the other cases listed in note 3 following its citation there. Because I conclude that in any event FTCA recovery cannot be sustained, I do not ultimately resolve this question. Rather, my dissent proceeds on the assumption, *arguendo only,* that the inclusion of these four facts in the press releases was a violation of section 6103.

*Telegram, Inc.,* 756 S.W.2d 103, 106 (Tex.App.—Austin, 1988;  no writ);  *Ross v. Midwest Communications, Inc.,* 870 F.2d 271, 274 (5th Cir.1989) ("name, residence, or "identity' are not easily characterized as "private, embarrassing facts.' ");  *Tobin v. Michigan Civil Service Comm'n,* 416 Mich. 661, 331 N.W.2d 184, 189 (1982) ("Names and addresses are not ordinarily personal, intimate, or embarrassing pieces of information").  *No* Texas (or other) authority to the contrary is cited by the majority.

Moreover, there is no evidence whatsoever that Johnson's middle initial, his age, his title at American National, and his home address, or any of these, were actually secret or concealed, or were regarded by him, or would be regarded by the average person, as private or embarrassing or intimate. To the contrary, they were obviously matters that Johnson, in the words of the *Restatement,* "leaves open to the public eye."  As to the middle initial, Johnson never complained of its disclosure in the press releases.  Rather, he took the position below that his counsel and the Assistant United States Attorney prosecuting the criminal case had "agreed that the criminal information and other papers filed with the Court would identify the Plaintiff as "Elvis E. Johnson.' ..."[7]  Further, the undisputed evidence at trial was that Johnson was listed in the Galveston telephone directory as "E.E. Johnson" with address of "25 Adler Circle" (the directory also separately listed him as "Johnny Johnson," again showing the same address and the same telephone number).  At the time of the events in issue, the Johnsons had lived at the Adler Circle address for at least seven years, during all of which time he had worked as an executive at the American National headquarters, which was in Galveston, and since

---

[7]See also note 13, *infra.*  The only plea agreement in the criminal case record does not contain this stipulation or any of the others claimed by Johnson.  This written plea agreement, signed by Johnson under oath, provides that the plea agreement is "to this effect, and no further," namely that Johnson will not be prosecuted for 1974 taxes nor his wife for either 1974 or 1975, and "the Government will not oppose a probated sentence."  It also recites that Johnson is pleading guilty "because I am guilty" and that he has "received no promises of leniency, or of any other nature, from my own attorney, from the attorney of the United States, or from any other person to induce me to plead guilty."

The agreement claimed by Johnson is one that he asserts was reached between his lawyer and the prosecution.  However, neither any prosecutor nor Johnson's criminal defense counsel testified as to any agreement between them, and Johnson did not claim to have been privy to any such agreement, but only testified to what his own lawyer (not any representative of the prosecution) told him about it.

1976 was Senior Executive Vice President there.  Johnson was the number two executive at American National and reported directly to its board of directors, of which he was one of the ten or twelve members.  Because the company's president did not drink, Johnson was in effect its chief entertainer, and when in Galveston conducted business entertaining almost nightly at his home there.  As a result, he said, "my home was sort of Grand Central Station" and his wife became "well known" for her role as hostess on these occasions.  Mrs. Johnson described herself as an unpaid "hostess for the Company" who, with her husband, "entertained in our home" and "was expected to be at all entertainment affairs to greet everyone who came in."

Moreover, Johnson testified that American National was a publicly-held corporation that sent annual reports to its shareholders.[8]  As such, we judicially know that the company was required by law to file annual reports with the Securities and Exchange Commission (SEC) that disclosed the name, age, and all positions and offices with the company held by each director and executive officer.[9]

---

[8]He also stated that when he came with the company in 1951 it was the eighteenth largest life insurance company, out of the some 17,000 such companies in the United States and Canada, that it had grown since then, that it had thousands of employees, and that it had made a profit of some $105 million the year before he left.

[9]17 C.F.R. § 240.13a-1 requires of publicly held companies the filing each year with the SEC of "an annual report on the appropriate form authorized or prescribed therefor."  The form prescribed for this purpose is the SEC Form 10-K.  See Ratner & Hazen, *Securities Regulation, Selected Statues, Rules, and Forms* (West 1993) at 912-22.  Item 10 of the form requires the same information concerning "Directors and Executive Officers" as is "required by Item 401 of Regulation S-K."  *Id.* at 920.  Item 401 of Regulation S-K requires, among other things, the listing of "the names and ages of all directors" and "of all executive officers" of the company, with "all positions and offices with" the company "held by each such person."  17 C.F.R. § 229.401(a) & (b).  Item 401 also provides in part as follows:

> "(f) *Involvement in certain legal proceedings.*  Describe any of the following events that occurred during the past five years and that are material to an evaluation of the ability or integrity of any director, person nominated to become a director or executive officer of the registrant;
>
> (2) Such person was convicted in a criminal proceeding or is a named subject of a pending criminal proceeding (excluding traffic violations and other minor offenses);  ..." 17 C.F.R. § 229.401(f).

The same requirements are all applicable to proxy statements, and these too must be filed with the SEC.  17 C.F.R. §§ 240.14a-3(a);  240.14a-6;  240.14a-101, Item 7(b).  Shareholders must receive proxy statements and annual reports at the same time each year.  17 C.F.R. § 240.14a-3(b).

The majority does not deny that items such as middle initial or age or address or job title are neither private nor intimate or embarrassing. Indeed, they rely on the *public* nature of that information about Johnson in contending that its inclusion in the press releases identified him to the public as the Elvis Johnson convicted of tax evasion.[10] The majority suggests that because (in its view) the information publicized in violation of section 6103—Johnson's middle initial, age, street address, and executive title—though not *otherwise* private nevertheless became so *because* it aided the public in identifying the plaintiff as being the Elvis Johnson of Galveston, an American National executive, who was convicted of tax evasion. But such a causal connection would not make the middle initial, street address, or the like "private" information; to the contrary, it emphasizes the non-private nature of that information. Of course, the publication of non-private information—*e.g.,* a person's name or other identifying public facts about him—can invade the subject's privacy *where* it publicly ties that individual to some *private* occurrence that *is* intimate or embarrassing; for example, publicizing that the person who is having the previously secret affair with Mrs. X is the man named Mr. Y who lives at such and such an address. Here, however, the non-private identifying information—middle initial, street address, etc.—ties the subject only to what is properly *public* (his tax evasion conviction).

---

We, of course, take judicial notice of federal regulations. *See, e.g., McCormick on Evidence* § 335 at 939 (3rd ed. 1984).

[10]The majority (fn. 20) does quote the language in *Restatement (Second) of Torts* § 652D comment *b* that "[i]f a record is one not open to public inspection, as in the case of income tax returns, it is not public, and there is an invasion of privacy when it is made so." However, this obviously does not mean that *whatever* appears on an individual's income tax return is therefore necessarily "private" information about him protected by the invasion of privacy tort, else we would have to conclude that whoever publicized the fact that William L. Garwood is a federal judge would thereby have invaded his privacy. What the quoted language *does* mean is that information that is *otherwise* "private" in the relevant sense does not *lose* its character as such by appearing on an official governmental record that is *not* open to public inspection, although it *would* lose its character as "private" *if* the record were open to public inspection. *See id.* comment *d.* The majority inferentially recognizes this by its statement in the text (Slip op. p. 386) that comment *b* uses "income tax returns as an example of records in which one *retains* a privacy interest." (emphasis added). Certainly Texas law follows this common sense approach, as the Texas Supreme Court clearly held in *Industrial Foundation* that information on a governmental record *not* open to public inspection could be partially non-"private"—such as the name of the person filing and the general nature of the form—and partially "private." *Id.* 540 S.W.2d at 686 (but if the government record *is* open to public inspection, then giving publicity to any of it is not tortious no matter how "private" what is publicized may otherwise be. *Id.* at 684).

The complete fallacy of the majority position in this respect is illustrated by its likening of the present case to one in which a newspaper identifies a woman as having AIDS by referring to her name, age, address, and employment. The majority says this example illustrates how public information (name, age, address, employment) can invade privacy. Similarly, it says, the publication of like information about Johnson (his middle initial, age, street address, position title) invaded his privacy. But in the majority's hypothetical, what was revealed was the *private* fact that the woman had AIDS; *here* what is complained of is the revelation that Johnson was convicted of federal felony tax fraud, which is *not*—and likely may not lawfully be—a *private* matter. Moreover, Johnson was not convicted under a pseudonym or concealed identity, but rather in open court—as required by the Constitution—under his own name (Elvis Johnson) pursuant to public proceedings that identified him as a Galveston resident employed as an American National executive having taxable income of $59,784.18 in 1975 (and Johnson himself contemplated that this public proceeding would also include reference to his middle initial "E"). As correctly assumed by the majority, nothing in section 6103 makes such information confidential or its publication unlawful or tortious. The majority's fallacy in this respect is again illustrated by its analogy to Tex.Code Crim.P. art. 57.02 regarding the use in certain proceedings of a victim's pseudonym. There is, however, no comparable statute—state or federal—for a felony defendant's use of a pseudonym. Certainly, section 6103 is not such a statute (and, just as certainly, Johnson did not use a pseudonym).

The majority also contends that section 6103 makes *any* information disclosed in violation thereof private, intimate, and embarrassing as a matter of law, and that Texas courts would therefore hold that whoever publicizes any information contrary to section 6103 commits the Texas tort of invasion of privacy.

There are several things wrong with this. To begin with, section 6103 does not say that whatever is in a tax return is always private, intimate, and embarrassing. A tax return typically shows the taxpayer's name, occupation, employer, and address. The majority would therefore have it that the facts that Ronald Reagan was President of the United States and lived at the White House are made private, intimate, and embarrassing by section 6103. Obviously, this is not what section 6103

is concerned with. Section 6103 is a regulation of the conduct of those who in the course of their duties as government employees or contractors glean information from tax returns. The regulation is *prophylactic,* proscribing disclosure by such an individual of *any* of such information *so obtained* by him. Plainly, Congress was not determining that *all* the information on a tax return would always be truly private and intimate or embarrassing. Rather, it was simply determining that since much of the information on tax returns does fall within that category, it was better to proscribe disclosure of *all* return information, rather than rely on *ad hoc* determinations by those with official access to returns as to whether particular items were or were not private, intimate, or embarrassing. Because such determinations would inevitably sometimes err, ultimately a broad prophylactic proscription would result in less disclosure by return handlers of such sensitive matters than would a more precisely tailored enactment.

Unlike section 6103, the Texas tort of "[p]ublic disclosure of embarrassing private facts about" another, *Industrial Foundation,* 540 S.W.2d at 682, is not concerned with the identity of the party making the disclosure, or his sources, but merely with whether the information disclosed is both private and intimate or embarrassing, and also not of public concern, *none* of which factors are relevant under section 6103 as the majority reads it. The Texas tort and section 6103 address totally distinct subject matters and impose distinctly different duties: the latter, applicable only to certain individuals who in connection with their government-related duties obtain tax return information, enjoins them not to disclose any of it so obtained, even though it is not private and not intimate or embarrassing and is of public concern; the former, applicable to all persons and regardless of the source of the information, proscribes publication thereof only if the matter is private and is intimate or embarrassing and is not of public concern.[11] Hence what the majority has really done is merely to

[11]The district court here found that the press release information was of public concern. 760 F.Supp. at 1232. Despite the fact that no challenge to that determination has been made on appeal, the majority, *sua sponte,* sets it aside. Two reasons are advanced, neither valid. The first is that the judge who took Johnson's criminal plea "did not find it necessary to include" Johnson's middle initial, home address, age, or the title of his executive position. "Include" in *what* is not stated. There is absolutely nothing to indicate that the judge ever gave any consideration whatever to such a matter, or that if he did he did not determine that the record was adequate for anyone interested to find out who the defendant was or that this would be disclosed in any event. It is simply preposterous to suggest that a district judge has determined that a felon's job title or

say that Texas courts would allow recovery for a violation of section 6103. This, in substance, is nothing more than allowing reco very on the basis of section 6103, which the FTCA does not authorize, as explained in my earlier dissent. 980 F.2d 1490 at 1506-1509. As we recently stated in *Tindall v. United States,* 901 F.2d 53, 56 n. 8 (5th Cir.1990), for purposes of the FTCA "a federal regulation cannot establish a duty owed to the plaintiff under state law."

Further, the majority not only misconstrues section 6103, but its reading of Texas law is likewise wholly unsupported. In substance, the majority admits that absent section 6103 these facts would not give rise to liability under the Texas common law tort of "public disclosure of embarrassing private facts about another," because the facts disclosed are not private, are not intimate or embarrassing, and relate to a matter of public concern. But *no* Texas case is cited in which a statutory duty not to disclose has been allowed to fill these gaps in a Texas invasion of privacy case.[12] Moreover, there exists a federal statutory cause of action for a section 6103 violation, namely section 7217, set out in my earlier dissent (980 F.2d at 1509-1510), which the majority concedes "is comprehensive in terms of allowing actions for breaches of section 6103" (n. 103). The majority has yet to cite any Texas case—or, indeed, any case from any other jurisdiction—that allows a common law cause of action based on a statutory violation where there is a comprehensive statutory cause of action for the very same statutory violation. As pointed out in my earlier dissent, 980 F.2d at 1510, this is especially anomalous where, as here, the claimed "*per se* " common law cause of action based on statutory violation is a state cause of action, but the statute violated and that creating the statutory

---

middle initial is not a matter of public concern merely because these are not reflected in the record. The second reason advanced by the majority is that section 6103, of its own force, establishes that these matters are not of public concern. But section 6103 does not shield the identity of convicted felons from public concern merely because they file tax returns stating their full name, address, and employment. Moreover, the majority's reliance on section 6103 in this respect to allow recovery where it would be denied under local law is but another proof that recovery is based on section 6103 and not on local law.

[12]Of course, as observed in note 10, *supra,* the Texas common law recognizes that the mere fact that information appears in an official *non* public record does not *preclude* its being private and intimate or embarrassing and not of public concern; but it does not make it so. Nor is any Texas (or other) case (or statute) cited for the majority's implicit proposition that a recent federal felony conviction is a private matter and not a matter of public concern; for these propositions the majority has nothing but section 6103 to rely on (though even it does not support them).

cause of action for the violation are both federal. I adhere to the view previously expressed, 980 F.2d at 1510-11, that the concededly comprehensive section 7217 preempts any such state law liability for violating section 6103, particularly for violations by federal employees acting in the course of their employment which are condemned by, and only by, section 6103(a)(1). *See, e.g., Boyle v. United Technologies Corp.,* 487 U.S. 500, 503-507, 108 S.Ct. 2510, 2514-15, 101 L.Ed.2d 442 (1988); *Atkinson v. Gates, McDonald & Co.,* 838 F.2d 808 (5th Cir.1988). But even if section 7217 were not preemptive, so that the Texas courts would be constitutionally free to create a common law cause of action for violating section 6103, there is nothing to indicate that they would do so. To repeat, Texas courts have *never* created a common law cause of action for a statutory violation for which there is an applicable, comprehensive statutory cause of action. The majority thus departs from our settled jurisprudence that "it is not for us to adopt innovative theories of recovery or defense for Texas law, but simply to apply that law as it currently exists." *Galindo v. Precision American Corp.,* 754 F.2d 1212, 1217 (5th Cir.1985) (footnote omitted). Among our many other opinions to the same effect are: *Junior Money Bags, Ltd. v. Segal,* 970 F.2d 1, 11 (5th Cir.1992); *Mitchell v. Random House, Inc.,* 865 F.2d 664, 672 (5th Cir.1989); *Graham v. Milky Way Barge, Inc.,* 824 F.2d 376, 381 (5th Cir.1987); *Harmon v. Grande Tire Co.,* 821 F.2d 252, 259 (5th Cir.1987). The district court was indeed correct in declining "to undertake what the Texas courts might well view as an impermissible expansion of this variant of the Texas right of privacy." 760 F.Supp. at 1232.

Causation

For the reasons stated in my earlier dissent, 980 F.2d at 1511-13, it is evident that Johnson has not proved that the section 6103 violation proximately caused his discharge. Any finding to the contrary is clearly erroneous.

It is well to recall that Johnson, as plaintiff, indisputably had the burden of proof on this issue. It is settled law in this Court that a finding of causation "may not rest on speculation and conjecture." *Nichols Const. Corp. v. Cessna Aircraft Co.,* 808 F.2d 340, 346 (5th Cir.1985). *See also id.* at 349.

Here no individual who participated in or was privy to the decision to terminate Johnson testified; nor did any person who claimed to have learned the reason for Johnson's termination from

anyone who participated in or was privy to the decision to terminate him. There was no documentary evidence concerning that decision. Apart from Johnson himself, no present or former American National officer, director, or employee testified. Only a majority of the board of directors could terminate Johnson. The general counsel and some directors, but not a majority, knew of his conviction before the first press release. The evidence shows that the entire board, and all the stockholders, would have learned of Johnson's conviction absent any press release, for Johnson himself testified:

> "Q. At some point you were going to tell the Board that you were a tax felon?
>
> A. It would be in the footnotes of the annual report, sir.
>
> Q. And would have gone out to the board of directors?
>
> A. And to the shareholders.
>
> Q. And to the shareholders. And you were going to do that regardless whether there was a press release?
>
> A. It would have to have been done, yes, sir."

There is *no* evidence that the entire board and the stockholders would *not* have learned of Johnson's conviction absent the press releases or either of them.

The majority infers that the board decided to terminate Johnson because the press releases publicly disclosed his conviction. As explained below, there is no evidence to support this. But even if there were, the only proper question is whether the inclusion in the press releases of the information proscribed by section 6103—Johnson's middle initial, his age, his street address, and the title of his executive position with American National—caused this decision. Any other test necessarily imposes liability not for the proscribed disclosures but for those the majority assumes are lawful. The April 17 press release redacted to eliminate this section 6103 material, reads as follows (bracketed material omitted):

> "INSURANCE EXECUTIVE PLEADS GUILTY IN TAX CASE
>
> GALVESTON, TEXAS—In U.S. District Court here, Apr. 10, Elvis [E.] Johnson, [59,] plead guilty to a charge of federal tax evasion. Judge Hugh Gibson sentenced Johnson [of 25 Adler Circle] to a six-month suspended prison term and one year supervised probation.
>
> Johnson, an executive [vice-president] for the American National Insurance

Corporation, was charged in a criminal information with willful evasion of federal tax by filing a false and fraudulent tax return for 1975.

In addition to the sentence, Johnson will be required to pay back taxes, plus penalties and interest."

There is not one shred of evidence that the inclusion of the bracketed material produced any result that would not have obtained had it been omitted. There is no evidence that *anyone* even believed that. The majority argues that inclusion of the bracketed material made it easier for the public to further identify the Elvis Johnson who was an American National executive and pleaded guilty to felony tax evasion. There is *no* testimony that the bracketed material was necessary to so identify him (or in fact actually aided in his being identified).[13] The record does not even hint at the possibility that there was any other American National executive named Elvis Johnson, much less one who in April 1981 pleaded guilty to tax evasion in Galveston federal court. It is evident—and would necessarily have been evident to the American National board—that the precise identity of the "executive for the American National Insurance Corporation" named "Elvis Johnson" described in the press releases as having pleaded guilty to federal tax fraud was easily determinable by anyone who read them. To sustain a finding of proximate cause, one must *assume,* in the absence of any evidence whatever tending to support such an assumption, that the American National board was concerned about publicity that an American National executive vice president named Elvis E. Johnson pleaded guilty to tax fraud but was *not* concerned about publicity that an American National executive named Elvis Johnson, who was readily identifiable as its executive vice president, did so. If that is not pure speculation and conjecture, then those words simply have no meaning.

Wholly apart from the foregoing, it is also evident—and would have been evident to the American National board—that even without any press release, Johnson's conviction would have been

_____

[13]Moreover, as the district court recognized, 760 F.Supp. at 1221; *Johnson v. Sawyer,* 640 F.Supp. 1126 at 1131 (S.D.Tex.1986), Johnson's suit does not complain of the inclusion in the press releases of his middle initial, and indeed he took the position below that his counsel's agreement with the Assistant United States Attorney was that the criminal information would state his name as "Elvis E. Johnson."

And, the information to which Johnson pleaded guilty, and which was and remained of public record, described him as "a resident of Galveston, Texas." His final plea agreement hence could not be inconsistent with public disclosure of that fact.

publicly disclosed.  As previously noted, Johnson himself testified that the fact of his conviction would have been included in the company's annual report sent to all of its shareholders and directors. There is not a shred of evidence, not a line of testimony, that this board of directors, or any board of any publicly-held company, would consider disclosure to its shareholders less significant than to Johnson's Galveston area acquaintances, or would not consider disclosure in its annual report as the substantial equivalent of public disclosure.

Moreover, federal regulations require that any criminal conviction not more than five years old (other than for traffic or other minor offense) of an executive officer or director of a publicly-held company be recorded in public filings with the SEC if "material to an evaluation of the ability or integrity of" the officer or director in question.  See note 9, *supra.*  Johnson was convicted of felony tax fraud in violation of 26 U.S.C. § 7201, an offense carrying a maximum five-year prison term. Conviction of this offense *necessarily* means that the defendant "acted willfully and knowingly with specific intent to evade his income tax obligations."  *United States v. Daniels,* 617 F.2d 146, 148 (5th Cir.1980).  And, the information to which Johnson pleaded guilty, and of which the district court convicted him, alleged that he "did willfully and knowingly attempt to evade and defeat a large part of the income tax due and owing by him" by preparing and filing "a false and fraudulent income tax return" that understated both his taxable income and income tax due by several thousand dollars "as he then and there well knew."  It is inconceivable that conviction for such an offense—a conviction that has never been challenged—is not, as a matter of law, "material to an evaluation of the ability or integrity of" Johnson.[14]

---

[14]The district court determined that omission of Johnson's conviction would not be "material" for purposes of Vernon's Tex.Civ.Stat. ann. art. 581-29C(3) as it was not a matter "that a reasonable investor would consider ... important in deciding whether to invest."  760 F.Supp. at 1230.  However, that is not the test for the specific relevant SEC filing requirement, which is rather the distinctly different, and narrower, test of whether "the conviction" is "material to an evaluation of the ability or integrity of" the particular convicted officer or director.  Moreover, there was *no* evidence that anyone would not consider Johnson's conviction material (or important) for either purpose.  The law has long considered conviction of any felony as material to an evaluation of the integrity of the person so convicted.  *Cf. Green v. Bock Laundry Mach. Co.,* 490 U.S. 504, 521-26, 109 S.Ct. 1981, 1991-93, 104 L.Ed.2d 557 (1989) (witness veracity); Tex.Ins.Code art. 21.07-3, § 12(f) (conviction of any felony grounds for revocation of license of managing general agent;  while Johnson may not have been a managing general agent, it is undisputed that a major portion of his duties consisted of performing functions very similar to

Press release or no, Johnson's conviction would have been disclosed, and there is certainly no contrary evidence.

The majority defends its affirmance by asserting that the government may not "rebut Johnson's probative evidence of proximate cause by mere guess or speculation." But, there is no probative evidence of proximate cause, rather there is merely speculation and conjecture as to what might have

those of a managing general agent as defined in Tex.Ins.Code art. 21.07-3 § 2(a)). *See also Huett v. State,* 672 S.W.2d 533, 540 (Tex.App.—Dallas 1984, pet. ref'd) (three prior felony theft convictions, though all on appeal, of senior executive officer are "material" in the sense of important to deciding whether to invest).

The majority's reliance on *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 447, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), and *Basic, Inc. v. Levison,* 485 U.S. 224, 230, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988), is unavailing. The question is not: *what is* "material"? That is defined in *TSC,* and reaffirmed in *Basic,* as "a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of a reasonable shareholder." *TSC,* 426 U.S. at 447, 96 S.Ct. at 2132. Rather, the question is: "material" *to what?* The answer varies with the subject matter (*i.e.,* "deliberations" about *what* ). In *TSC* "material" meant "material" to "deciding how to vote," *id.,* not, as the district court and the majority would have it, "deciding whether to invest." Here the SEC regulations, 17 C.F.R. § 229.401(f), expressly give us the "material" *to what* answer, *viz:* "material to an evaluation of the ability or integrity of any director ... or executive officer." The district court and the majority err in applying a material *to* "deciding whether to invest" standard rather than the regulation commanded standard of "material to an evaluation of the ability or integrity of any director ... or executive officer."

Further, the district court grounded its determination in this regard on the hypothetical "reasonable investor who knew all the circumstances behind Johnson's conviction." 760 F.Supp. at 1230. These circumstances, as found by the district court, were that Johnson never knew that his return contained any discrepancies or misstatements (or understatements of taxable income or overstatement or misstatement of deductions), until after it was filed and the IRS began investigating him. But, this is wholly inconsistent with the conviction itself as *Daniels,* to say nothing of the wording of the information, makes plain. *See also United States v. Garber,* 607 F.2d 92, 97-98 (5th Cir.1979) ("a negligent, careless, or unintentional understatement of income" does not violate section 7201; rather, "[t]he Government must demonstrate that the defendant willfully concealed and omitted from her return income which she knew was taxable"). It is what Johnson was "convicted" for—not what he says he did—that is subject to the test of whether it is "material to an evaluation of" his "integrity." And, as the district court recognized, Johnson's conviction was a matter "of legitimate public concern." 760 F.Supp. at 1232. In any event, as the government pointed out to the district court, in this suit by Johnson against the United States, Johnson is estopped from taking any position inconsistent with his subsisting section 7201 conviction. *Piper v. United States,* 392 F.2d 462, 464-65 (5th Cir.1968); *Tomlinson v. Lefkowitz,* 334 F.2d 262, 264-65 (5th Cir.1963), *cert. denied,* 379 U.S. 962, 85 S.Ct. 650, 13 L.Ed.2d 556 (1965); *United States v. Thomas,* 709 F.2d 968, 972 (5th Cir.1983). Finally, there is no hint in the evidence that the board would not have deemed Johnson's conviction material for purposes of the referenced SEC disclosure requirements for officers and directors.

motivated the board. This is an issue on which Johnson has the burden of proof. The government does not have the burden to prove that the press releases—more precisely, the miniscule parts of them disclosed contrary to section 6103—did *not* cause his discharge; rather, it is Johnson's burden to prove that they did. Perhaps the possibility of causation is not affirmatively wholly excluded. But that does not suffice. As a distinguished panel said, sustaining a judgment n.o.v. for the defendant: "evidence which does nothing more than show that the injury could have possibly occurred through a certain way or means, cannot justify the conclusion that it occurred that way or by that means." *Green v. Reynolds Metals Company,* 328 F.2d 372, 375 (5th Cir.1964).

## Conclusion

The majority wrongfully authorizes FTCA recovery based on liability ultimately imposed only by federal law. Moreover, in the process it finds Texas law in a way no Texas court has ever found it, and, as well, wrongfully concludes that the comprehensive section 7217 does not preempt any state law cause of action for federal employee violation of section 6103(a)(1). Finally, the majority ignores the burden of proof and, without a shred of evidential support beyond the purest speculation and conjecture, sustains the wholly illogical finding that Johnson's dismissal was caused by the inclusion in the press releases of his middle initial, age, street address, and job title, notwithstanding that the press releases legitimately disclosed his first and last name, that he was an American National executive, and that on April 10, 1981, he pleaded guilty in Galveston federal court to felony tax fraud. I respectfully dissent.

. . . . .